52 Cal.App.4th 183 (1996)
In re HEATHER A. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent,
v.
HAROLD A., Defendant and Appellant.
Docket No. B095308.
Court of Appeals of California, Second District, Division Three.
December 24, 1996.
*186 COUNSEL
Heather M. Giannini for Defendant and Appellant.
De Witt W. Clinton, County Counsel, Gary P. Gross and Sterling Honea for Plaintiff and Respondent.
OPINION
CROSKEY, J.
In this dependency case, Harold A. (Father), challenges the sufficiency of the evidence to support the jurisdiction and disposition orders made regarding his minor twin daughters, Helen A. (Helen) and Heather A. (Heather). He also asserts the court failed to put certain findings in the record. Part of the evidence before the dependency court focused on the concepts of secondary abuse and battered women's syndrome, as they relate to the children (or stepchildren, foster children, etc.) of victims of domestic violence. "Secondary abuse" refers to the effect on children of occurrences of abuse in their environment which are not directed specifically at them. Battered women's syndrome is that collection of symptoms commonly experienced by victims of domestic abuse. Here, there is evidence that the minor children were exposed to domestic violence in their father's home. *187 This evidence, together with other evidence in the record, supports the orders challenged by Father and we therefore affirm the judgment.

BACKGROUND OF THE CASE

1. Events Leading to Jurisdiction Over the Minors

On December 13, 1994, the department of children and family services (DCFS) filed a petition alleging the minor girls are persons coming within section 300 of the Welfare and Institutions Code,[1] specifically subdivisions (a), (b), (c), (d), (g), and (i) of section 300.[2] The minors, who were born July 31, 1991, had been taken into custody on December 9, 1994, and placed with their stepmother, Ramona A. (Ramona). At that time, the whereabouts of their biological mother, Susan K., were unknown. A detention hearing was held December 14, 1994, with the court ordering the minors detained and placed in shelter care.[3]
A January 1995 report from the social workers states that Ramona related several incidents of spousal abuse by Father during June, July, August, and September of 1994, including his choking, pushing, and hitting her. The abuse also included threats by Father to kill Ramona, threats with a gun, and firing a gun at her. Ramona stated the minors had witnessed some of the incidents. In a social worker's interview with Father, he denied sexually abusing the minors and denied Heather and Helen had witnessed any of his fights with Ramona. He admitted to physically abusing Ramona in *188 September 1994 and stated he and Ramona have had verbal arguments, during which he has restrained her by holding her down.

2. The Adjudication Hearing

On March 8 and 9, 1995, the court took evidence regarding jurisdiction. Ramona testified to incidents of spousal abuse against her and estimated they had occurred five times. She described incidents where she was hit and choked by Father, and also described an incident when she sustained a fracture and cuts to her head because of his violence. She stated the minor children were present in the home during the abuse but abuse was not done in front of them. However, she also stated that one of the incidents of abuse occurred in a hotel room and the children were in the room.
The court determined it had jurisdiction over the minors, finding the petition true and sustained as to the following matters: (1) the "minors are periodically exposed to violent confrontations between their father and stepmother that endanger their physical and emotional safety," and (2) the minors' mother's whereabouts are unknown. The court found the minors are described by subdivisions (b) and (g) of section 300.

3. The Disposition Hearing

a. Father's and Ramona's Testimony

Disposition hearings were held on June 21 and 22, 1995. Ramona testified she had been physically abused by Father about eight times and on four or five of those occasions the minors had been present. During one of the incidents, Father smashed a glass vase and one of the minors cut her finger and foot on the glass and needed medical attention. In another incident, when the minors were approximately three years old, Father had pushed Ramona on the floor and was hitting her, and Heather attempted to get Father off of Ramona. Asked about the girls' whereabouts during the September 1994 incident which sent her to hospital with a head fracture, Ramona stated the children were initially not present. They were asleep in another part of the house. However, after the violence started and Ramona was bleeding in the head, the minors woke up and came to see what was happening. The girls went with Ramona to the hospital. In addition to Ramona's testimony regarding domestic violence, there was evidence of Father's abuse of other women. The minors' biological mother (Mother) reported to a social worker that Father had threatened to kill her and himself on one occasion.
*189 Father denied hitting Ramona.[4] He admitted injuring her but stated he did not intend to. He stated there has been pushing and shoving and that there have been times when Ramona was the aggressor and injured him. He was unclear as to the frequency of altercations between Ramona and himself. He stated there had only been three incidents of violence during his whole relationship with Ramona, but then he stated there were six to eight incidents where he had to restrain Ramona. He mentioned there had been numerous times that he and Ramona argued. According to him, the minors never witnessed physical violence but did witness the arguments. He said he pleaded no contest to the charge he had abused Ramona because he wanted to preserve the family. He admitted that currently there was a spousal abuse case against him in the district attorney's office. He denied that the girls are hesitant to visit with him, although he stated they were at first.

b. The Expert's Report

The court-appointed expert, Barry T. Hirsch, Ph.D., provided a report for the disposition hearing. Dr. Hirsch interviewed Father, Ramona, Heather, Helen, Mother, the minors' Optimists Home social worker (Renee Cote), and others. In answer to the question "What is the likelihood that the minors Heather and Helen [A.] will be physically/emotionally abused by a parent and/or member of the household?" Dr. Hirsch gave the following answer: "There is no information available to me that I consider to be reliable at the time of the writing of this report that either Minor has ever been directly physically or emotionally abused by any parent or member of the household of Harold and Ramona [A.]. There is evidence that they may have suffered secondary abuse associated with the domestic violence they were exposed to between [Father] and Ramona ..., but due to their age and impaired language ability this cannot be firmly substantiated."[5] (Italics added.) Hirsch defined "secondary abuse" as a label for a concept coined by him, which he *190 had documented, that "children are affected by what goes on around them as well as what is directly done to them." He noted that "There is ample evidence that there has been repeated ongoing domestic violence between [Father and Ramona] when the twins were present to raise the issue of secondary abuse of the Minors." Dr. Hirsch noted that although Ramona was repeatedly abused by Father, she kept returning to him because of battered women's syndrome, which he described as a "pattern of learned helplessness and dependency, originating in childhood, which, without intervention, is perpetuated throughout the victim's life that psychologically causes her to return again and again to relationships in which she is battered and abused." (Italics added.)
Hirsch's psychological testing of Father resulted in a clinical profile showing Father "is a person who is very sensitive to criticism and tends to overreact to minor problems with anger or hostility. He trusts no one and is constantly on guard to prevent others from doing him harm or injustice." The report also describes Father as being unable to compromise and "a person who broods and [sic] great deal and becomes hostile when he feels threatened. He also tends to hold grudges and seeks to get even with others for perceived wrongs. His mistrusting and jealous behavior may place strains on his marriage. Individuals with his profile are seen as petulant and testy in *191 relationships. He is seen as a person who is likely to quarrel a great deal and continually bring up old issues and arguments."[6]
Dr. Hirsch stated his belief that Helen and Heather "are bonded and securely attached to both [Father and Ramona]." He based this belief on the information he received from documents and from persons he interviewed for his report. He did not interview the minors together with Father and/or Ramona. Other persons had a different opinion regarding Heather's and Helen's attachment to Ramona and Father.[7]

c. The Various Recommendations for Custody

In his report, Dr. Hirsch concluded that Father, Ramona and Mother should all be excluded as caretakers of Heather and Helen "until and unless such people have evidenced sufficient change in their psychological functioning that they can demonstrate being adequate parents." As reasons for excluding Father as a caretaker, Hirsch cited (1) Father's "long history of disruptive emotional relationships with women"; (2) Father's criminal record, (he fled Minnesota when he was charged with rape; he was arrested in 1972 in regard to a civil suit; he was jailed in 1973 for refusal to testify; he was arrested in 1971 and charged with fraud); (3) the contrast between Father's age and physical condition, and that of the minors (Father was 58 *192 years old when Hirsch made his report and he has severe degenerative arthritis in his left hip which may require extensive surgery in the future, whereas the minors are active 4-year-olds); and (4) Father's psychological problems, as outlined in Hirsch's report.
Dr. Gloria Montgomery of the Hollywood and Vine Recovery Center, where Ramona and Father had taken counseling for a while until they were asked to leave, was also of the belief that neither of them should be a custodial parent for the minors. Maty Chiquiar believed there was not enough information on whether Father's and Ramona's domestic violence situation had been resolved and whether the children would be safe if returned to them.

d. The Court's Analysis of the Evidence and Its Decision

Upon submission of the case for disposition, the court stated its concerns. It described Heather and Helen as "damaged," noting their speech is delayed and they are reluctant to visit with Father, Ramona and Halleigh. It noted that part of Father's plan for caring for the girls, should they be returned to him, included having Halleigh help with their care.
Additionally, the court indicated its concern about the domestic violence experienced by the children, saying that it impacts on the minors, even if they are not the ones being physically stricken by the abuser, because they see and hear the violence and the screaming. Thus, the court reiterated Dr. Hirsch's concern of secondary abuse by exposure to violence. The court found there was extensive domestic violence during the minors' lives, both with Mother and Ramona as their female caretakers, and indicated its concern that the violence had continued even after the court became involved with the case. The court stated that besides Ramona, "it could be some other lady, or some other person, or even a child that could set off the Father." Noting Father's explanation that it is others who cause the domestic problems, the court observed that Father is in denial about his violence.
The court found, by clear and convincing evidence, that the current conditions were such that "there exists substantial danger to the physical health of the minors or would be if the minors were returned to the home. And there is no reasonable means by which the minors' physical health can be protected without removing [them] from the parent's custody." (§ 361, subd. (b).) The court ordered that these dependent children would remain placed in foster care.

CONTENTIONS ON APPEAL
On appeal, Father contends (1) there was insufficient evidence to support a finding of jurisdiction; (2) there was insufficient evidence to support *193 removing the minors from Father's custody; (3) the court made no statements regarding reasonable efforts to avoid removal of the minors from Father's custody; and (4) the court erred in not stating the facts on which it based its decision to remove custody.[8]

DISCUSSION

1. Burdens of Proof and Standards of Review

(1) At a jurisdictional hearing, a finding that the minor is a person described in section 300 must be supported by a preponderance of the evidence. (§ 355; Cynthia D. v. Superior Court (1993) 5 Cal.4th 242, 248 [19 Cal. Rptr.2d 698, 851 P.2d 1307].) (2) At the disposition hearing, a child may not be removed from the custody of the parent(s) with whom he or she resided at the time the petition was initiated unless the court finds, by clear and convincing evidence, at least one of the matters set out in subdivision (b) of section 361, which includes the finding made by the trial court in this case. (Cynthia D., supra, 5 Cal.4th at p. 248.) This finding was based on the following provision in section 361: "There is a substantial danger to the physical health of the minor or would be if the minor was returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents' or guardians' physical custody." (§ 361, subd. (b)(1).)
(3) In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. (In re Tania S. (1992) 5 Cal. App.4th 728, 733 [7 Cal. Rptr.2d 60].) In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court. (Ibid.) In the instant case, there is substantial evidence to support both the jurisdiction and disposition orders of the dependency court.

2. Substantial Evidence Supports the Trial Court's Decisions

a. The Jurisdictional Finding

(4) Father challenges the sufficiency of the evidence to support the court's decision that Helen and Heather are minors described by subdivision *194 (b) of section 300. The court based its decision in part on count IV of the petition, which alleged that the minors were periodically exposed to violent confrontations between Father and Ramona which endanger their physical and emotional safety. There was substantial evidence of continuing violence between Ramona and Father. Ramona stated there were five instances of such violence. There was evidence that one occurred in front of the children while the others occurred when the children were elsewhere in the home. Obviously the children were put in a position of physical danger from this violence, since, for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg, or by Ramona falling against them.[9]
Father contends that the requirements for a finding under section 300, subdivision (b), as set out in In re Rocco M. (1991) 1 Cal. App.4th 814 [2 Cal. Rptr.2d 429], are not met here. Rocco speaks of "three elements: (1) neglectful conduct by the parent in one of the specified forms [in subdivision (b), such as a parent's failure to adequately supervise or protect a minor]; (2) causation; and (3) `serious physical harm or illness' to the minor, or a `substantial risk' of such harm or illness." (Id. at p. 820.) It is clear to this court that domestic violence in the same household where children are living is neglect; it is a failure to protect Helen and Heather from the substantial risk of encountering the violence and suffering serious physical harm or illness from it. Such neglect causes the risk.

b. The Disposition Finding

(5) Contrary to Father's assertion, there is sufficient evidence to support removing the minors from Father's custody. The profile study performed by Dr. Hirsch, as well as other evidence, shows Father is prone to hostility and violence in his relationships with others, including his relationships with women. There is evidence that Ramona was not the only wife he battered. Further, at the time of the disposition hearing, Father admitted there was currently a pending spousal abuse charge against him in the district attorney's office. Additionally, the evidence shows he moves from one domestic *195 relationship to another. Indeed, Hirsch's report refers to Father's "long history of disruptive emotional relationships with women." Therefore, even if Father never had any further contact with Ramona or with Mother, there was good reason to believe he would enter into another domestic relationship with someone else and his pattern of domestic abuse would continue.[10] Permitting Helen and Heather to remain with Father at that point in time would condemn them to a situation where they could again be physically harmed during the domestic abuse, by contact with an object (thrown, knocked over, broken) or a person, even if Father did not intend for them to be harmed.
Additionally, three experts were of the opinion that Heather and Helen should not be returned to Father at that point in time. Dr. Hirsch and Maty Chiquiar both questioned whether Father had resolved his negative psychological tendencies. Hirsch specifically noted, among other concerns, that Father repeatedly became involved in dysfunctional relationships with women, and Chiquiar questioned whether the girls would be safe if returned to Father.
Further, there is the matter of the secondary abuse which Dr. Hirsch wrote about, to wit, that "children are affected by what goes on around them as well as what is directly done to them."[11] A form of secondary abuse is the battered women's syndrome, described by Dr. Hirsch as a "pattern of learned helplessness and dependency, originating in childhood, which, without intervention, is perpetuated throughout the victim's life that psychologically causes her to return again and again to relationships in which she is battered and abused." (Italics added.) If Heather and Helen's exposure to Father's domestic violence had not already sown the seeds in them for battered women's syndrome, further exposure to Father could do so, thus resulting in substantial danger to their future physical health in that they would submit to *196 being battered themselves.[12] Father's psychological profile shows a man who tends to overreact with hostility and anger when faced with problems.

3. Reasonable Efforts and Articulated Facts Regarding Removal From Custody

(6) Subdivision (c) of section 361 requires the dependency court to "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home." Subdivision (c) also requires the court to "state the facts on which the decision to remove the minor is based." Father asserts the court failed to comply with both of these directives. Father is wrong on both counts.
The minute order for June 22, 1995, shows the court found that reasonable efforts were made. Nevertheless, Father argues that the court had an alternative to removing custody. Father asserts the court could have permitted him to retain custody of Heather and Helen "on the condition that [Father] not invite a domestic partner into the home with the minors." However, such an arrangement would not have dealt with the minors' obvious fear and anxiety about being around Father. Further, Father's psychological profile, in Dr. Hirsch's report, shows Father is a person who, among other negative traits, "tends to overreact to minor problems with anger or hostility," and blames others for his problems. There is no indication in the report that these characteristics are only manifest when Father is interacting with a domestic partner. Thus, the minors themselves could be the recipients of this anger, hostility and blame. Further, there is no indication that Father's violent, abusive tendencies are only limited to "domestic partners," and not to other women to whom the minors might be exposed, such as Father's dates and acquaintances.
As for the requirement that the dependency court state the factual basis for its disposition decision, we have previously noted how the court in this case spoke at length about its concerns over having custody remain with Father, including the violence in the minors' lives, the secondary impact it has on them, and Father's denial of the depth of that violence and his part in it.

*197 4. Conclusion

The record shows the orders challenged by Father are proper and there is no cause to reverse or modify the judgment.[13]

DISPOSITION
The judgment appealed from is affirmed.
Klein, P.J., and Aldrich, J., concurred.
Appellant's petition for review by the Supreme Court was denied March 12, 1997.
NOTES
[1] In this opinion, all references to statutes are to the Welfare and Institutions Code.
[2] The dependency court ultimately determined that Heather and Helen are minors described by subdivisions (b) and (g) of section 300.

Subdivision (b) states in relevant part: "The minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the minor...."
Subdivision (g) states: "The minor has been left without any provision for support; the minor's parent has been incarcerated or institutionalized and cannot arrange for the care of the minor; or a relative or other adult custodian with whom the minor resides or has been left is unwilling or unable to provide care or support for the minor, the whereabouts of the parent is unknown, and reasonable efforts to locate the parent have been unsuccessful."
The court stated subdivision (g) relates to the minors' biological mother.
[3] The record shows this family first came to the attention of DCFS in September 1994 when Ramona was hospitalized with a head fracture as a result of being physically abused by Father. (Father pleaded no contest to a charge of spousal abuse.) Pursuant to a statement by Ramona that Father sexually, physically and emotionally abused Helen and Heather, the minors were examined at a hospital for sexual abuse. No physical evidence of the abuse was found, but the examining doctor noted that not all types of such abuse leave physical evidence.
[4] Father also denied having any violent confrontations with Mother, but he admitted that another of his wives accused him of domestic violence. The record shows Father has been married at least seven times (including a marriage entered into after this appeal was filed), and has fathered at least seven children. Some of the children he fathered in extramarital relationships. He has a master's degree in theology and psychology, a doctorate in divinity, and has been a minister since 1961.
[5] Both Dr. Hirsch and Maty Chiquiar related speech patterns in the girls which were abnormal. (Ms. Chiquiar is the assistant director of the emergency and assessment shelter of Children's Institute International, and is also the case manager for the minors. The minors lived at the shelter during a relevant period of the dependency proceedings.) There were no conclusions as to whether any of the speech abnormality was related to the home life the minors had experienced with Father and Ramona. There was evidence that the care given to them in their very early years caused problems with their verbal abilities, which Dr. Hirsch described as having been "retarded" by their living with Mother while Father was traveling in Europe.

Additionally, Hirsch noted that persons who had spoken with the minors three months prior to his interview of them had described the minors' language development as much better than what he (Hirsch) had observed. Regarding these discrepancies, Hirsch stated: "I have no way of explaining the differences in observations and note that [the minors'] language deterioration to that I observed could only have occurred from some severe trauma occurring to both Minors after they were removed from the custody of Harold and Ramona [A.]." Apparently after being taken into custody, the girls stopped speaking to a large degree, but when they were removed from a foster home to the Children's Institute shelter, they became somewhat more verbal, especially Heather.
Father asserts that given this evidence of the minors' communication skills and efforts, DCFS should have alleged, in its petition, dependency jurisdiction based on subdivision (c) of section 300 (serious emotional damage or substantial risk of serious emotional damage as a result of the parent or guardian's conduct). However, Father also asserts that this evidence would be insufficient to support a section 300, subdivision (c) finding. Thus, Father's argument goes, because subdivision (c) was not plead, the court had to rely on the subdivision (b) count (minor has suffered serious physical harm or illness or there is substantial risk of such harm or illness), and the evidence regarding the girls' speech was not sufficient to support the disposition order on that count. We need not concern ourselves with whether this speech-related evidence would support the trial court's disposition order because, as discussed ante, evidence of (1) past physical harm and (2) potential physical harm in living in a domestic battering environment, including harm relating to the secondary abuse of the children, does support the section 300, subdivision (b)-based disposition order.
[6] According to a social worker's report submitted by DCFS for the disposition hearing, Maty Chiquiar found Father to be "very controlling and rigid during visits [with the minors]. He brings toys and tells minors what to do. He does not ask minors what they want to do. Both minors pull back during the beginning of the visits."
[7] Maty Chiquiar testified she sees Heather and Helen for at least an hour every day and she monitors Father's and Ramona's visits with the girls. At that time, Father and Ramona had each been visiting the girls twice a week but not sharing visits. She reported that during the entire time she has been monitoring these visits, both girls always consent to the visits but when they approach the visiting area, they pull back and approach both Father and Ramona, especially Father, with caution. Ms. Chiquiar described the minors as being tense and apprehensive. She stated this behavior is unusual because even children who have been severely abused or traumatized are anxious to see their parents. Also, neither girl seems to have any difficulty separating from either Ramona or Father after the visits. Chiquiar stated this is also unusual behavior. These behaviors had been going on since March 1995. Further, the staff at the Children's Institute observed the minors "continue to be anxious and apprehensive abut [sic] the visits.... Minors do not appear to be attached to anyone." Chiquiar stated that she will leave the girls alone with Father during the visits, but that she is "still in the area." One of Father's older children, Halleigh (who lived in Father's home when the minors were very young) has visited with the girls at the Children's Institute. Chiquiar noted that the first time Halleigh came to visit the girls at the institute, the girls "cried and screamed hysterically." She described them as being "terrified." The girls were removed from the scene. Father's explanation for their reaction was that they were upset because Halleigh had not come to visit the previous week even though Father had told them she would. Chiquiar stated the minors have adjusted to seeing Halleigh although, as with Father and Ramona, they "pull back" at the beginning of Halleigh's visits.
[8] In his opening brief, Father also contends that the court erred at the disposition hearing when it adjudged the minor children were dependent children under section 300, subdivision (j). However, as respondent points out, and as the disposition order shows, the court did not find that subdivision (j) was implicated in this case. Indeed, the petition does not even allege a subdivision (j) count. Father does not reargue this issue in his reply brief, and we find it has no merit.
[9] This possibility of injury was confirmed when, at the disposition hearing, Ramona testified that one of the minors had actually been cut on the finger and foot by a glass vase broken during an altercation between Father and Ramona. Father contends that this injury would have occurred whether the vase was broken by accident or in anger, because the injury was the result of no one having cleaned up the broken glass during the five-hour period following the fight. This contention has no merit. Ramona's testimony showed it was the domestic violence which caused both the breaking of the vase and the delay in cleaning up the broken glass.
[10] The record shows Father and Ramona had indicated, prior to the disposition hearing, that they would be filing for a divorce. Thus, the court had even more reason to believe Father would become involved in another domestic relationship. As noted earlier, after the disposition hearing, Father and Ramona did divorce and Father married again, just one year after that hearing.
[11] This concept of secondary abuse was recognized in In re Jon N. (1986) 179 Cal. App.3d 156, 161 [224 Cal. Rptr. 319], where a father questioned the suitability of the minor's mother to be custodial parent. There had been ongoing domestic violence between the minor's parents. The court stated: "Clearly, the [dependency] court had before it sufficient evidence of the dangers to the child arising from confrontations between the parents; on one occasion the father struck the mother in the same room where the child was, causing a wound requiring six stitches. This was one of many violent altercations, which must inevitably have affected the child even though he has not yet been physically injured."
[12] Removing custody from Father had the additional advantage of giving Heather and Helen some breathing room. There is substantial evidence in the record that the girls were not comfortable around him, despite his many visits with them, and despite the fact that they knew they would only be with him for a short period of time when he visited them. It is not unreasonable to infer that returning them to Father at that point in time would cause them substantial anxiety, which would only be heightened by Father's plans to have his daughter Halleigh, a person to whom the minors had a very negative reaction, help care for the minors. As our footnote 13 indicates, subsequent positive steps taken by Father after he was denied custody appear to have fostered the girls' desire to resume living with him.
[13] According to documents filed by the parties after oral argument on this appeal, Father has had significant counseling on domestic violence and interpersonal relationships, and has been given a significant increase in visits with Heather and Helen. While the documents are encouraging insofar as they point toward a reunification of Father with the minors, they are not relevant to issues raised by Father in this appeal, since those issues concern only events taking place at, and prior to, the disposition hearing.

The postargument documents reveal that after the disposition order was made, Helen and Heather were moved from the Children's Institute shelter to a foster home to which they had been "transitioned" by having them become familiar with the foster mother prior to living with her. (They were in two foster homes prior to going to the institute shelter.) The girls remain at their new foster home, have adjusted well, and are bonded to the foster mother. They enrolled in preschool and are doing well there. They started individual play therapy at Children's Institute and the therapist reports they have become increasingly verbal, expressive, and spontaneous with their speech and emotions since these changes. They are attempting to make sense of their relationships with the many adults and caregivers in their lives.
Father enrolled in a domestic violence abuse prevention program and a psychotherapy group for men ("Men in Relationships"), and attended the sessions regularly. He completed a parenting class and was consistent in his visits with the minors. He was advanced to unmonitored visits and then to overnight weekend visits.
By late May 1996, the girls still had not disclosed anxiety about being separated from Father and Ramona. However, Heather vocalized wanting to live with Father, and Helen stated she wanted to live with Father and with the foster mother and the foster mother's granddaughter. Both girls are bonding to Father's new wife.
In July 1996, the court granted Father a 60-day visit with the children. The court ordered that Father and the girls would participate in counseling together. The DCFS report for the September 1996 hearing recommends that the girls be returned to Father's home but that they remain dependents of the court. It states Father continues in his abuse prevention program and Men in Relationships program and the girls continue weekly play therapy with Maty Chiquiar at Children's Institute, who reports the girls are happy with Father and his new wife.
It thus appears that the dependency court's orders have had a sobering, beneficial effect on Father, with positive consequences for Helen and Heather, which hopefully will continue.