Filed 7/17/13  In re Joshua G. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JOSHUA G. et al., Persons Coming Under the Juvenile Court Law. | B243290 (Los Angeles County Super. Ct. No. CK93555) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ARTHUR G. et al., Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Donna Levin, Juvenile Court Referee.  Affirmed.

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant Arthur G.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant Carol G.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

A father and mother appeal from the dependency court's jurisdictional and dispositional orders after the father admitted sexually abusing a child in his care. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

On May 3, 2012, Arthur G., a registered nurse at Huntington Beach Memorial Hospital, was arrested and charged with lewd and lascivious acts upon a child under 14 years of age in violation of Penal Code section 288, subdivision (a). An 11-year-old girl in Arthur's care who suffered from a seizure disorder was being monitored at all times by video camera and was required to have someone in her hospital room with her at all times. Family members would stay with her but sometimes nurses would relieve the family members to allow them to take breaks. The girl told police that on April 27, a male nurse came into her room to relieve her grandfather. He touched her shoulder and chest, then moved his hand under her sweatpants and underpants and rubbed her vagina for about 30 seconds before washing his hands. Later when the grandfather left the room a second time, the nurse again put his hand under her underpants and rubbed her vagina for about 30 second before washing his hands.

The girl first told her grandfather what had happened and he reported it to the hospital. When Arthur reported to work on April 30, he was advised of the allegations and suspended pending further investigation. He called to arrange a meeting with human resources personnel to respond to the allegations on May 2. During the meeting, he was nervous and withdrawn and seemed to be stalling but then admitted he had redirected a video camera and touched the child's vagina. After being advised of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), he agreed to speak with police without an attorney. He admitted he had redirected the camera so he would not be seen and then touched the girl's vagina with his right hand two times, about 30 minutes apart. He said he had thought he would get sexual satisfaction when he touched her "down there" but

2

did not get the sensation he expected the first time so he touched her again to see if he could get more sexual satisfaction. He said it was not as fulfilling as he had hoped. He admitted it was a "stupid thing to do." He said he believed he was taking advantage of her medical condition such that she was at the end of a seizure and was unconscious at the time. Asked if he had done this before, he said it was the first time he was assigned to her. He said he had not done anything like this before.

Arthur's arrest led to a child abuse referral to the Department of Children and Family Services (the Department). The Department made an unannounced visit to Arthur's home on May 8; his wife Carol had posted his bail and Arthur was home. He told the social worker there was no physical evidence or proof he molested the child and she was "just making a claim."

Arthur and Carol's children (14-year-old Bethany, 12-year-old Rachel and 16-year-old Joshua) told the social worker they had never been touched by anyone on private areas of their bodies and no one had ever asked them to touch their private areas; no one had told them to keep secrets about inappropriate touching at home and they were not afraid of anyone at home.

That same day, Detectives Kim and Lang and Sergeant Carrillo interviewed Arthur. He again told police he "kn[e]w [his] *Miranda* rights" and said he would answer questions regarding the investigation. Arthur, along with the detectives and sergeant, watched the hospital video at the time Arthur's patient claimed he had molested her. Reviewing the video, he said the patient appeared to be having a seizure when he (Arthur) passed through the scene from left to right. The video scene then shifted to the right and away from the patient. Arthur said he had moved the camera away from the patient and said "stupidity" was the reason. He said he had moved the camera so the patient would not be on it, stating: "I guess in that stupidity I shouldn't have never gone further. I accidentally, not accidentally, but I actually touched her down below."

3

Initially, he said his purpose was to determine whether she had soiled herself—touching her vagina with his hand, skin to skin beneath her clothing, for several seconds. He admitted it was "[p]robably not the best way" to check a patient and probably was not an approved method in hospital protocol. When he moved the camera back to the patient, her legs were spread apart although her legs had been together before the camera was moved. Within a minute, the camera was moved to the right again. Arthur said he "[m]ust have touched her that time again," a second time. When a hand could be seen in the frame, Arthur said, "It looks like I'm opening her legs." Asked why he needed to check again since he said he had just checked the patient, he answered, "That's when I put my hand in again, a second time." He said he touched the outer portion of the patient's clothes, moving his hand in an up and down motion for about five to ten seconds. Minutes after the camera was moved away from the patient the second time, it was moved back, and her legs were spread apart. Asked if he had touched her any further, Arthur said he may have touched her later during his shift. He denied any other similar conduct while working at the hospital. He expressed remorse for the patient's family and said he felt he had sinned against God.

Arthur and Carol signed a safety plan requiring Arthur to remain out of the home and Carol to protect the children from Arthur. Carol said she understood a patient was making a claim against Arthur, but there was no proof anything had actually occurred.

Two days later, the social worker spoke with Carol about statements in the police report attributed to Arthur indicating he had touched the patient for sexual gratification. Carol said the police had not questioned Arthur appropriately and believed errors in the investigation would be brought out in criminal court. She would continue to protect her children but said there was no cause for concern as Arthur loved the children very much and had never abused them.

A few days later, Carol said she wanted Arthur back home because the children needed him, and she was struggling as a single parent trying to handle her work and the children's activities and school. Arthur agreed to having the children removed from his custody and that his visits and telephone calls would be monitored.

The social worker assessed the family as being at very high risk of sexual abuse by Arthur, recommending the children's continued removal from his custody. Pursuant to subdivisions (b) and (d) of Welfare and Institutions Code section 300, the Department filed a petition on the children's behalf, alleging as follows: "On 04/27/12, the children Joshua [G.], Bethany [G.] and Rachel [G.]'s father, Arthur [G.] sexually abused an 11-year-old unrelated child [identifying her by first name], by repeatedly fondling the unrelated child's vagina.[1] On 05/02/12, [Arthur] was arrested for lewd acts against the child. Such sexual abuse of the unrelated child by the father endangers the children's physical health and safety [and] creates a detrimental home environment, placing the children at risk of harm, damage, danger, sexual abuse."

At the detention hearing, the dependency court found a prima facie case for removing the children from Arthur's custody; the children were allowed to remain with Carol. The dependency court ordered family maintenance services for Carol and family reunification services for Arthur, with Arthur's visits to be monitored by a DCFS-approved monitor.

 A dependency investigator interviewed Arthur on May 25. Arthur said his lawyer had told him not to discuss his criminal case. He told the investigator he had worked as a nurse and had been a model employee for more than 20 years, but the hospital had terminated him because of the allegations. He said human resources personnel told him during his interview that he had admitted molesting the girl but said they had twisted everything around until he was confused and they had taken things out of context. He

---

1       All undesignated statutory references are to the Welfare and Institutions Code.

5

also said he had demanded an attorney during his police interview and asked how he could get an attorney, but the police continued to ask questions and he tried to answer to the best of his ability.

On June 5, Carol told the investigator her family was falling apart and losing their closeness. She wanted to be approved as Arthur's visitation monitor; she said she would closely monitor him at all times and would cancel the visit and notify the social worker if she had any concerns. The Department recommended her approval. In addition, the Department asked that the petition be sustained, with Carol to receive family maintenance services and Arthur to receive reunification services. The Department recommended that Carol attend weekly individual counseling, a sexual abuse awareness program, participate in family therapy with the children and participate in intensive in-home family preservation services. For Arthur, the Department recommended he attend a sexual abuse program for perpetrators, individual therapy and family therapy when the children's therapist deemed it appropriate. The Department also recommended the children participate in individual counseling and family therapy as deemed appropriate by their therapist.

In late May, Carol wrote a letter in support of Arthur and detailing how the allegations had devastated the family with Arthur losing his job and not being around to help with the children. Joshua told the social worker he would never believe Arthur would do what he had been accused of doing and he knew Arthur had not sexually abused the patient; his mother told him his father did not molest the girl. Bethany and Rachel did not believe the allegations either. Carol said she and Arthur had been married for 16 years. She was devastated and totally shocked by the allegations. She believed in Arthur and said they would prove in court Arthur had been coerced by the police and the allegations were false.

In late June, the dependency court set the petition for a contested hearing in July. On that date, the Department offered the reports into evidence and rested. No other party offered any evidence. Although Arthur was denying the allegations now, County counsel argued Arthur had already admitted the allegations to the hospital staff and to police, and the children were at substantial risk of abuse because Arthur was denying the molestation, he had received no counseling and the children were close to the victim's age. Although Carol was not named in the petition, her continued belief Arthur was innocent limited her ability to protect the children.

The children's counsel indicated the children denied any abuse and wanted their father home but urged the court to sustain the petition, declare the children dependents, then terminate jurisdiction with a family law order granting Carol sole custody with monitored visits for Arthur.

Arthur's counsel argued the petition should be dismissed as the child father molested was not a sibling so there was no evidence the children were at risk of sexual abuse.

The dependency court found the evidence did not satisfy subdivision (b) of section 300 as Carol was not named in the petition, but as to subdivision (d), noted Arthur's relationship with the victim as her nurse was analogous to that of a father and daughter although the risk was not the same for Joshua. The court dismissed Joshua from the petition but sustained it as amended, declaring Rachel and Bethany dependents in need of the court's protection.

For disposition, Arthur's counsel asked the court to allow the family to attend counseling through their church and conjoint counseling outside the church, but said sexual abuse counseling for perpetrators and individual counseling were not warranted because he had sought counseling through his church. Counsel objected to sexual abuse counseling and conjoint counseling and requested termination of the case with a family law order or unmonitored visitation for Arthur.

7

Carol's attorney argued conjoint and individual counseling were unnecessary, but sexual awareness counseling might be. Carol had been monitoring visits and asked for termination with a family law order or monitored visits at home.

The dependency court found the case involved very serious acts by Arthur and he had some serious issues to address that could not be addressed by a peer counselor at church but authorized family conjoint counseling at the church if the Department approved of the program. The court was unwilling to terminate jurisdiction in the belief Arthur would be back home the next day in that event, and Carol had not dealt with the circumstances. The court removed the children from Arthur's custody and ordered Arthur to participate in conjoint counseling with the children, sex abuse counseling for perpetrators, and individual counseling to address case issues. Visits could be monitored by Carol outside the home. The children were to participate in conjoint counseling with their parents and be assessed for individual counseling. The court ordered family preservation services for Carol.

Arthur and Carol appeal, with Carol specifying the orders for visitation outside the home and for counseling.

On November 11, 2012, Arthur was convicted of violating Penal Code section 288, subdivision (a) and sentenced to one year in the Los Angeles County Jail.

We requested and received the dependency court's subsequent minute orders for proceedings beyond those reflected in the record on appeal. According to these orders, on June 14, 2013, dependency jurisdiction was terminated, with a family law order awarding Carol sole legal and physical custody with monitored visits for Arthur.[2]

---

[2] Pursuant to Evidence Code sections 452, subdivision (d), and 459, subdivision (a), we take judicial notice of the June 14, 2013 minute order. (See *In re C.C.* (2009) 172 Cal.App.4th 1481, 1487, fn. 3.)

8

## DISCUSSION

As a preliminary matter, we first consider whether Arthur's and Carol's appeals are moot in light of the termination of the dependency court's jurisdiction.[3] "As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot. (*In re Michelle M.* (1992) 8 Cal.App.4th 326, 330 [10 Cal. Rptr. 2d 64].) However, dismissal for mootness in such circumstances is not automatic, but 'must be decided on a case-by-case basis.' (*In re Kristin B.* (1986) 187 Cal.App.3d 596, 605 [232 Cal. Rptr. 36]; *In re Hirenia C.* (1993) 18 Cal.App.4th 504, 517–518 [22 Cal. Rptr. 2d 443]; see *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1404 [81 Cal. Rptr. 3d 747].)" (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.)

For example, where the dependency court's jurisdictional findings have adversely affected custody rights or could have severe and unfair consequences in future family law or dependency proceedings if erroneous, termination of dependency jurisdiction does not moot a parent's appeal. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 716; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1431-1432; *In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1548.) Therefore, we proceed to the merits of Arthur's and Carol's appeals.

According to Arthur, the dependency court's conclusion his daughters are at substantial risk of sexual abuse under subdivision (d) of section 300 based on his conduct with an unrelated child is a "non sequitur" because he says there is no link between the alleged abuse and the family's home or his biological children. Carol says there was no evidence she needed any assistance from the Department to meet her family's needs. We disagree.

To conclude that a child is described by subdivision (d) of section 300, the dependency court must find by a preponderance of the evidence that the child has been

---

[3] Arthur and Carol each join in the other's briefs to the extent they support their own arguments.

9

sexually abused or is at substantial risk of being sexually abused as defined in subdivision (b) of section 11165.1 of the Penal Code by his or her parent, guardian, or a member of the child's household. (§ 300, subd. (d); § 355, subd. (a).) Arthur does not deny that he sexually abused the 11-year-old girl in his care at the hospital. Citing *In re Maria R.* (2010) 185 Cal.App.4th 48, 63-68; *In re Rubisela E.* (2000) 85 Cal.App.4th 177, 198-199; and *In re Alexis S.* (2012) 205 Cal.App.4th 48, 54-55, however, Arthur says the "defect in [the dependency court's] reasoning" is "identical to the defect in logic and proof that has led multiple Courts of Appeal to reject the notion that a parent's sexual abuse of a female child is, standing alone, sufficient to demonstrate a substantial risk of sexual abuse to a male sibling."

Recently, our Supreme Court expressly disapproved of these cases to the extent they are inconsistent with its decision in *In re I.J.* (2013) 56 Cal.4th 766, 780-781. Reviewing several of the "sharply conflicting results" in a number of cases to consider whether sexual abuse of a daughter supports finding a son to be a dependent of the court, the *I.J.* court emphasized that section 300 does not require that a child actually be abused before the dependency court assumes jurisdiction. (*Id*. at pp. 773-774.) "Section 355.1, subdivision (d), provides that a prior finding of sexual abuse (*of anyone, not just a sibling*) is prima facie evidence that the child who is the subject of the dependency hearing is subject to the court's jurisdiction under section 300. When it enacted subdivision (d) of section 355.1, the Legislature found 'that children of the State of California are placed at risk when permitted contact with a parent or caretaker who has committed a sex crime. Further, the Legislature finds that children subject to juvenile court dependency jurisdiction based on allegations of molestation are in need of protection from those persons.' (Stats. 1999, ch. 417, § 1, p. 2780.)" (*Id.* at p. 779, italics added.) Even though there had been no finding in a *prior* proceeding in that case, our Supreme Court indicated "section 355.1 is relevant because it evinces a legislative

10

intent that *sexual abuse of someone else, without more*, at least supports a dependency finding." (*Ibid.,* citing *In re P.A.* (2006) 144 Cal.App.4th 1339, 1347, italics added.)

As the court concluded in *I.J.,* "'The juvenile court is mandated to focus on "ensur[ing] the safety, protection, and physical and emotional well-being of children who are at risk" of physical, sexual or emotional abuse. (§ 300.2.) That is what the court did here.'" (56 Cal.4th at p. 780.) "'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A*. (1996) 52 Cal.App.4th 183, 193 [60 Cal. Rptr. 2d 315].) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'" [Citation.]" (*In re Matthew S*. (1988) 201 Cal. App. 3d 315, 321 [247 Cal. Rptr. 100].)' (See *In re Angelia P*. (1981) 28 Cal.3d 908, 924 [171 Cal. Rptr. 637, 623 P.2d 198].)" (*In re I.J., supra,* 56 Cal.4th at p. 773.)

Considering the facts that Arthur had sexually abused a young girl in his care—a girl about the same age as his daughters—because he thought she was unconscious and he could get away with it, coupled with the fact he maintained nothing had happened, substantial evidence supports the dependency court's orders as to Arthur. (*I.J., supra,* 56 Cal.4th at p. 780 .)

In addition to joining Arthur's arguments on appeal, Carol says that "irrespective of her hopes and beliefs that [Arthur] was innocent of the criminal charges brought

11

against him, there was no evidence [she] needed the [Department's] assistance" to meet her children's needs; as a non-offending parent under the section 300 petition, she says there was no reason she could not monitor Arthur's visits in the home, rather than outside, and she did not need any counseling. She acknowledges that, in this context, an appellate court's task "is to review the evidence to determine whether it is legally sufficient to support the trial court's implied conclusion [the orders made are] reasonably necessary . . . ." (*In re Jasmin C.* (2003) 106 Cal.App.4th 177, 180.) The dependency court "may make 'all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child . . . .' (§ 362, subd. (a).)" (*Ibid.*) The dependency court has "wide latitude in making orders necessary for the well-being of a minor," to the extent such orders are "designed to eliminate the conditions that brought the minor to the attention of the court. (§ 362, subd. (c).)" (*Ibid.*)

To the extent Carol challenges the dependency court's order for services (counseling) already rendered and received, her appeal is arguably moot as we cannot rescind services already provided and received. (*In re Pablo D.* (1998) 67 Cal.App.4th 759, 761.) However, in an abundance of caution, for purposes of any family law proceedings (or dependency proceedings, if any) and to the extent the subsequent dependency court and family court orders are premised on the orders Carol challenges here, we find substantial evidence supports the dependency court's orders relating to the children's supervision and monitored visitation with Arthur outside the home (see *In re Vonda M.* (1987) 190 Cal.App.3d 753, 757 ["The more likely it is that the offending parent will have further contact with the nonoffending parent, the more the child's welfare is jeopardized by being placed unsupervised with the nonoffending parent"]) as well as for Carol's participation in counseling where she maintained her belief in Arthur's innocence and told her children the charges against him were false. (*Ibid.* ["dependency jurisdiction must depend on the welfare of the child, not the fault or lack of fault of the parents"].)

12

*DISPOSITION*

The orders are affirmed.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**

**ZELON, J.**