Filed 7/14/21  In re Noah M. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re NOAH M., a Person Coming Under the Juvenile Court Law. | B309460 |
| | (Los Angeles County Super. Ct. No. 20CCJP04956) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
|     Plaintiff and Respondent, | |
|     v. | |
| SHARON M., | |
|     Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael E. Whitaker, Judge.  Affirmed.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

————————————

The juvenile court declared minor Noah M. a dependent of the juvenile court and removed him from the custody of his mother, appellant Sharon M. (Mother), without also finding she had abused, abandoned, or neglected her son.  Did the juvenile court err?  The answer is no.  This appeal prompts us to discuss the infrequently invoked principle that the juvenile court may exercise jurisdiction over a minor who is at substantial risk of harm, even though the parent is not culpable in creating that risk.  We affirm the juvenile court.

## FACTUAL AND PROCEDURAL BACKGROUND

## I.    The Petition

The Welfare and Institutions Code[1] section 300 petition, filed September 21, 2020, included 3 counts.  Count a-1 alleged that on "prior occasions" Mother physically abused the child by punching and striking him with metal spoons; pulling his hair; inflicting nail marks on the child's arms when she restrained him; kicking the child; pinning the child's head to a wall and forcefully pressing the child's head down toward a pillow causing the child to have difficulty breathing.  This count alleged the physical abuse was excessive, caused the child unreasonable plain and suffering and, as a result, the child was afraid of mother and did not wish to reside with her.  The physical abuse endangered the child's physical health and safety and placed the child at risk of serious physical harm.

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

Count b-1 was based on the same factual allegations and alleged the child's physical health and safety were at risk because Mother, "as a result of . . . failure or inability", did not adequately protect the child.

Count b-2 alleged the child has mental and emotional problems including suicidal and homicidal ideation, aggressive and assaultive behavior which renders Mother "unable to provide the child with appropriate parental care and supervision." On a prior occasion the child exhibited anger by punching and throwing chairs and objects at Mother. In September 2020, the child exhibited anger in that he threatened Mother by putting a knife into a nerf gun and shooting it at her, causing Mother to restrain the child and resulting in hospitalization of the child in a psychiatric facility. "The mother's limited ability to provide the child with appropriate parental care and supervision endangers the child's physical health and safety and places the child at risk of serious physical harm, damage and danger."

In 2020, when the petition was filed, Noah was 14 years old. Three months earlier, on June 26, 2020, the court had appointed Noah's maternal grandfather as his temporary guardian and since that date, Noah had been in placement with his grandfather.

## II.    Facts Before the Court

In 2006, when he was three months old, Noah suffered a traumatic brain injury – subarachnoid bleeding and bilateral retinal hemorrhages, epilepticus, and a subdural hematoma with bleeding to the left and right sides of the brain. The juvenile court sustained a petition alleging Noah's injuries were consistent with inflicted trauma. The petition also alleged Noah's parents engaged in a violent altercation in his presence resulting

3

in Father physically assaulting Mother by striking her body. Mother also violated a restraining order by allowing Father to reside in the home and have unlimited access to the child. Father was separately alleged to have a criminal history of battery which endangered Noah's physical and emotional health and safety and placed him at risk of physical harm.

In 2007, when Noah was 15 months old, the juvenile court sustained a second petition alleging Mother illegally used methamphetamine, which endangered Noah's physical and emotional health. Noah's maternal grandparents were appointed his guardians until 2009, when the case was terminated and Noah was returned to his mother. Father, by this time, was out of the family's life and Mother was raising her brain-damaged son alone, although for much of the time Mother's boyfriend resided with them.

Most recently, a caller advised DCFS that on September 3, 2020 Noah told his therapist Mother had put her hand on his face and prevented him from breathing. She then took him to a bed and put her arm around his neck and stopped him from breathing. Noah reported being afraid of Mother in the past; after disclosing this information, he then refused to disclose anything else to the therapist.

DCFS investigated the referral by interviewing Noah, maternal grandfather and his girlfriend, Mother, maternal aunt, and Noah's therapist.

<u>Maternal Grandfather</u>: In June 2020, he was appointed Noah's temporary guardian and Noah was indeed living with him. Grandfather stated the child's father disappeared after Noah's brain injury which the family believed was inflicted by

father.  Grandfather stated he has delegated Noah's medical care to Mother who knows his medical needs and providers.

At the time of the interview in September 2020, Noah was on a 5150 hold because Mother had taken him to the hospital due to his aggressive behavior.  Grandfather reported Noah has anger issues related to his traumatic brain injury, which makes it difficult for him to control his emotions.  He also advised Noah tends to exaggerate to get what he wants.  He accuses one adult to curry favor with another.  Grandfather confirmed Mother was now drug-free and was not abusive or neglectful towards Noah. The family was concerned about Noah's anger issues and wanted help for him.  According to grandfather, Noah is no longer afraid of Mother and gets so aggressive Mother has to physically restrain him to control him.  Noah was not currently enrolled in school because he was bullied in the past and Mother homeschools him.  Noah does not carry a weapon and is neither suicidal or homicidal.  Grandfather wanted Noah admitted to a hospital to get help for his anger issues.

<u>Grandfather's girlfriend Grace</u>:  Grace described Noah's behavior as impatience rather than aggression.  She stated Mother is not abusive with Noah who is "difficult to handle."

<u>Maternal aunt CR</u>:  CR stated she did not believe Noah was behaving inappropriately until she observed Noah threaten Mother with bodily harm.  She stated Noah put something, possibly a knife, in a nerf gun and shot it at Mother.  His traumatic brain injury affects his impulse control and causes him to confuse reality with fantasy.  For example, if he sees something violent on television or in a movie, he will think Mother is doing it to him.  In addition to his brain injury, Noah suffered bullying at school and fell into a fire pit seven years ago,

resulting in burns and scarring to his arms and lower back. He takes out his resentment on Mother and becomes angry when he does not like what she directs him to do. CR described Noah as "manipulative" and stated she has "caught him in lies." CR concluded Noah needed help and medication, and the only reason he does not want to live with Mother is because she tells him what to do, whereas grandfather is less confrontational.

Mother: Mother stated Noah recently put a knife into a nerf gun and shot it at her. At that point she felt he needed to be in a hospital on medication. In the past, he has threatened to kill himself, Mother, and other family members. He has thrown chairs and objects at her as well as punched her. She stated she restrains him only when he has a knife or sharp object in his hands and she does so by taking his arms and pinning him against a wall or to the ground to take the object from him; she then walks away. She has seen him with knives on multiple occasions and does not know where he obtains them. She has found knives buried in the backyard. She recently had him hospitalized on a 5150 hold because she needed to get help for him. She denied physically abusing Noah and stated she has had to isolate herself from her friends because they want to call law enforcement when they witness his behavior towards her. She also characterized her son as manipulative to the point where he will say anything to get his way. Mother asserted Noah is not at fault for his behaviors because he cannot control himself due to his brain injury. She wants to continue to help her son meet milestones and overcome his disabilities.

Mother stated Noah was living with his grandfather. Recently Noah came to visit her and became upset when she told him to do something he did not want to do. He went into his

bedroom and returned with a knife in his hand. Mother wrestled the knife out of his hand. The next day Mother took Noah to work with her and on the way home in the car, he was hitting Mother with a basketball while she was driving. When they arrived home, he threatened to kill himself so she decided to take him to the hospital where he was placed on a 5150 hold. She stated she would cooperate with DCFS in getting Noah a placement and services.

Noah's therapist: He stated Noah has been diagnosed with traumatic brain injury, PTSD, oppositional defiant disorder, major depression in remission, and ADHD. Noah's medical history also includes diagnoses of shaken baby syndrome, concussion, infantile spasms, bilateral extremity hypertonia, grand mal seizures, epilepsy, severe Stage 3 burns requiring skin grafts, tiptoe walking and frequent tripping requiring leg braces, cerebral palsy, temporary blindness, significant problems with gait, balance, coordination and large body gross motor skills. He is not on medication and currently needs a higher level of care as he is very aggressive, angry, and uncooperative during therapy sessions. Noah is neither suicidal nor homicidal, although he has threatened to tell law enforcement that he is. The therapist is not sure whether he can believe Noah's accusations of physical abuse because the therapist's own observations of the family lead him to believe Mother is not abusive.

Noah: Noah was interviewed at the hospital where he was on a 5150 hold. He stated he did not feel safe with Mother and she "physically and verbally hits me." He alleged Mother "punch[ed] like a man" and left nail marks on his arms when she tried to restrain him. (No marks were observed during the interview.) Noah claimed Mother disciplined him by pulling his

7

hair, shaking hair, hitting with metal spoons, and hitting him harder when he cries. However, now when Mother hits him, Noah hits her back. He stated he and Mother "fight like animals" and are "not good for each other." He accused Mother of baiting him with remarks that anger him. He now carries a knife to cope with her and feel safe. He denied pulling a knife on Mother, instead asserting he was just showing the knife to her when she recently called law enforcement for help. He stated the family did not want him to tell law enforcement about his mother's assaults on him because the family does not want her to go to jail. As a result, he felt pressure not to say anything. Noah concluded he wanted to return to his grandfather's home where he feels safe. He denied being aggressive, homicidal or suicidal. He stated when he is angry, he works out or punches a punching bag. He stood by the allegations of physical abuse alleged against Mother in the petition.

DCFS concluded that court involvement was warranted to ensure Noah's safety and emotional well-being, as Mother appeared to be a trigger to Noah, causing him to be upset and aggressive with her, all of which endangered his physical and emotional well-being. Noah himself acknowledged they physically engaged with each other and "are not good for each other." In recommending that Noah be removed from Mother to ensure his safety, DCFS noted that recently Noah was examined in the emergency room as he had bruises on his buttocks and legs. Noah stated Mother had hit him with a broomstick, chased him, and cursed at him. He locked himself in a truck to protect himself. He also stated he had fallen during a physical struggle with Mother and injured his arm.

A school neuropsychology assessment dated May 17, 2020, attempted to sum up Noah's situation: "There are mental health concerns in this evaluation. Noah has a long history of bullying and types of subtle abuse within the school setting and also has been exposed to significant types of disruption at home and even violence by his stepfather. Moreover, he has had long-term disabilities that he has been teased and harassed for and also significant burns on his body related to a fire. Noah tends to try to be an optimistic youngster and rather than become overly depressed, which was apparent several years ago when he wanted to die, he has developed copying mechanisms of fighting back and becoming more brash and standing up for himself. His attachment to adult figures has been disrupted. Chronic fighting and chaos related to his stepfather and conflict with his mother (his primary caretaker and sole teacher the last 17 months) has deterred normal levels of connection and trust. Moreover, the losses associated with severe disabilities related to the brain injury concomitant with disfigurement from the fire and years of chronic teasing, pushing, bullying, and physical threats have left him mistrusting of people in general and somewhat helpless. Formerly depressed and suicidal, he now protects himself with a false sense of bravado and indifference. Moreover, he does have posttraumatic stress related to having a knife pulled on him at school, years of physical and emotional bullying at school, and chronic conflict at home."

Noah's Individual Program Plan (IPP), dated August 6, 2019 and prepared by the Inland Counties Regional Center, stated similar conclusions about his behavior: "Noah has a history of physical aggression, self-injurious behaviors, major property damage and outbursts/tantrums." His Individualized Education

Plan (IEP), dated July 22, 2020, noted that when last in school in 2018, he had "off task, non-compliant disruptive behaviors for up to 10 minutes at a time several times during a school day." In addition, the IEP noted that because Noah reports "feelings of being misunderstood especially by his peer group," conflicts arise and he "is not implementing conflict resolution steps and therefore may experience anger, arguing, and altercations may ensue."

### III. The Juvenile Court's Findings

Adjudication came on for hearing on December 1, 2020. The court dismissed counts a-1 and b-1, the counts alleging physical abuse, for "no sufficient competent evidence of any current neglectful conduct, causation, or substantial risk of serious physical harm or illness to the minor child." The court sustained count b-2, finding DCFS had met its burden of proving that Noah's behavior and Mother's inability to supervise him endangered his physical and emotional health. The court declared Noah a dependent of the court and ordered him removed from Mother and suitably placed under DCFS's care and supervision. The court ordered family reunification services; monitored visitation with a written visitation schedule; conjoint counseling for Mother and Noah; a parenting program for special needs children; and individual counseling.

Mother appeals.

### DISCUSSION

The sole issue on appeal is the propriety of the juvenile court's exercise of jurisdiction over Noah after finding that Mother had neither abused, abandoned nor neglected her son. We note Mother does not challenge the removal order itself

except to the extent that it is the result of an erroneous exercise of jurisdiction.

We review the record for substantial evidence. "[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193, disapproved on other grounds in *In re R.T.* (2017) 3 Cal.5th 622, 628 (*R.T.*).)

The juvenile court exercised jurisdiction under section 300, subdivision (b)(1), which provides: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." The leading case addressing this uncommon situation is *R.T.*, where the facts closely mirror those before us. R.T. was a 17-year-old girl who, at age 14, began running away from home for days at a time and skipping school. She falsely reported her mother had abused her. (*R.T.*, *supra*, 3 Cal.5th at p. 625.) At age 15, R.T. gave birth to a daughter (who became a juvenile court dependent) and had another child a few years later. (*Ibid.*) Mother tried unsuccessfully to supervise and protect R.T. and sought support from DCFS and law enforcement. She later arranged for R.T. to live with maternal grandparents because R.T.'s grandfather used to work with troubled youth and R.T.'s history of falsely reporting abuse by mother made it difficult for mother to discipline her. (*Ibid.*) R.T. struggled with "anger management issues" as it was reported she threw a chair at her maternal grandfather. (*Ibid.*) The juvenile court asserted

11

jurisdiction over R.T., reasoning that " 'the mother cannot control [R.T.] so she has given her off to grandparents and they can't control her either.' " (*Ibid.*)

In affirming the juvenile court's exercise of jurisdiction, our Supreme Court directly embraced mother's insistence that "she was not at fault or blameworthy because she did everything possible to control R.T.'s incorrigible behavior." It also agreed with mother that she "did not *create*" the danger that R.T. would be at risk of serious physical harm. (*R.T.*, *supra*, 3 Cal.5th at p. 633.) From that baseline, the Court began with an analysis of section 300: " 'Generally speaking, Section 300 defines jurisdiction in terms of serious harm suffered by a child or the substantial risk of such serious harm to a child. Although the harm or risk of harm to the child must generally be the result of an act, omission or inability of one of the parents or guardians, the central focus of dependency jurisdiction is clearly on the child rather than the parent.' " (*R.T.*, at p. 626, quoting Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2017 ed.) § 2.14, p. 2–40.) The Court then framed the question at hand: "[M]ust a parent in some way be blameworthy for being unable to supervise or protect her child? Or does the parent's failure or inability alone support a juvenile court's assertion of dependency jurisdiction under section 300(b)(1)?" (*R.T.*, at p. 627, fn. omitted.) After extensively analyzing the statute, the Court noted that "[b]ecause the Legislature has made parental culpability (based on either willful or negligent conduct) a requirement in some, but not all, grounds for asserting dependency jurisdiction under section 300, we may conclude that the omission of a culpability requirement in the first clause of section 300(b)(1) 'was purposeful.' " (*R.T.,* at p. 630.) It found the

statute's legislative evolution supported the conclusion that "by including—and not repealing—the phrase 'or inability' in the first clause of section 300(b)(1), the Legislature intended to include children like R.T., i.e., those at substantial risk of serious physical harm due to no fault of the parent, within the purview of dependency jurisdiction." (*R.T.,* at p. 632.)

Like R.T.'s mother, here Mother argues her son's substantial risk of serious physical harm is not "as a result of" her inability to protect or supervise him. She argues lack of causation. Put another way, Mother maintains the risk of harm to her son has nothing to do with what she did or did not do and that her son's condition was alone responsible for causing his behavior.

In *R.T.*, when faced with the "colorable claim based on causation", the Court noted "R.T. faced an ongoing risk of harm based on her increasingly self-destructive behavior, behavior that mother simply could not control" and the record "supports a theory suggesting that R.T.'s disobedience was the reason mother was unable to protect or supervise R.T." (*R.T., supra*, 3 Cal.5th at p. 634.) Nevertheless, acknowledging the causation argument "has some merit," the Court found substantial evidence to support exercise of jurisdiction. "Whether it was R.T.'s misbehavior and disobedience, or mother's inability to supervise or protect R.T., that initiated this cyclical pattern of conflict, does not matter here. The basis for jurisdiction under section 300(b)(1) is whether the child is at 'substantial risk' of 'serious physical harm or illness.' " (*R.T.,* at p. 634.) That fact was undisputed, so that court concluded "there is little question that mother was unable to 'adequately' supervise or protect R.T., as required under section 300(b)(1)." (*R.T.,* at p. 635.) Poignantly,

13

the Court concluded: " 'The loss of parental control is rarely if ever attributable solely to the parent or the child. It is instead the result of a long and complicated chain of actions and reactions culminating in the child's refusal to submit to parental authority. To attempt to affix responsibility on one party or the other is alien not only to the spirit and letter of the juvenile court laws, but to any realistic view of family relationships.' " (*Ibid*.) When the "child's behavior places her at substantial risk of serious physical harm, and a parent is unable to protect or supervise that child, the juvenile court's assertion of jurisdiction is authorized under section 300(b)(1)." (*R.T.,* at p. 637.)

 We find *R.T.* is controlling authority on the facts before us. We accept Mother's thesis that Noah's traumatic brain injury prompts his reckless, disobedient and dangerous behavior. Nonetheless, we find substantial undisputed evidence of an unremitting and admitted cycle of physical altercations between Mother and Noah; a persistent practice by Noah of carrying, brandishing, and hiding knives, whether for his own protection as he claims or for some other reason; an unwillingness or inability by Noah to follow Mother's instructions combined with founded and unfounded accusations against her and a strong if misguided belief that he needs to protect himself against her; and Mother's devoted, but ineffectual attempts to control his behavior, whether through physical restraint or verbal direction. These facts place Noah at substantial risk of serious physical harm. That Mother is not culpable in "causing" this risk does not deprive the juvenile court of jurisdiction.

## DISPOSITION

The judgment of the juvenile court is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, J.

We concur:

GRIMES, Acting P. J.

WILEY, J.