Filed 8/12/14  M.J. v. Superior Court CA5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| M.J.,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>THE SUPERIOR COURT OF STANISLAUS COUNTY,<br><br>　　　　　Respondent;<br><br>STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>　　　　　Real Party in Interest. | F069515<br><br>(Super. Ct. No. 516661)<br><br><br>**O P I N I O N** |

## THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Ann Q. Ameral, Judge.

M.J., in pro per., for Petitioner.

No appearance for Respondent.

John P. Doering, County Counsel, and Maria Elena Ratliff, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]　　　Before Kane, Acting P.J., Detjen, J., and Franson, J.

Petitioner M.J. (father) in propria persona seeks extraordinary writ review (Cal. Rules of Court, rules 8.450-8.452) of the juvenile court's orders terminating his reunification services as to his one-year-old son M.D. under Welfare and Institutions Code section 388, subdivision (c)(1)(B)[1] and setting a section 366.26 hearing. We deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

Father and Michelle are the unmarried parents of one-year-old M.D. Michelle has an approximate 15-year history of methamphetamine use which began when she was 15 years old. As a result of her drug use, she lost her parental rights to an infant son in June 2004. During the dependency proceedings for her son, Michelle gave birth to a daughter. She and the daughter tested positive for amphetamines. The child was removed from Michelle's custody and she was denied reunification services. The child's father successfully reunified with her. Also around this same time, Michelle was charged with possession of a controlled substance and apparently pled guilty. The criminal court entered a deferred judgment on the condition she complete a drug court program. Michelle did not complete the program and was convicted of the charge.

In April 2013, Michelle gave birth to M.D. She and M.D. tested positive for amphetamine. Michelle identified father as one of two men who could be M.D.'s father. She said she and father had been in a relationship for five years but terminated the relationship. She said she was in a relationship with Raymond, the other alleged father. The Stanislaus County Community Service Agency (agency) took M.D. into protective custody.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Father said he was willing to care for M.D. if he was his child.  Father admitted to using methamphetamine, marijuana and cocaine but said he had not used drugs for 15 years.  However, the criminal database showed that he was arrested in February 2011 for possession of a controlled substance.  The court entered a deferred judgment on the condition that father complete a drug court program.  In September 2012, father successfully completed the program.

The juvenile court ordered M.D. detained and ordered father and Raymond to undergo paternity testing.  In May 2013, the agency placed M.D. in the home of Mr. and Mrs. O.

In July 2013, the juvenile court adjudged M.D. its dependent.  By this time, father's biological paternity had been established and, at Michelle's request, the agency allowed joint visitation with M.D.  Meanwhile, Michelle continued to use methamphetamine.  At the dispositional hearing conducted the same month, the juvenile court denied Michelle reunification services but ordered reunification services for father and set a six-month review hearing for January 2014.  His services plan required him to complete a domestic violence assessment, participate in substance abuse treatment, submit to random drug testing and attend a minimum of three Alcoholics/Narcotics Anonymous (AA/NA) meetings each week.

In December 2013, the agency filed its report for the six-month review hearing asking the juvenile court to continue father's reunification services and grant it discretion to allow overnight and weekend visits.  The agency reported that father had demonstrated a willingness and capacity to actively participate in and complete his services.  He entered residential treatment in July 2013 and tested positive for methamphetamine.  However, he went on to complete residential and day treatment and tested negative for drugs.  He continued to do well in the intensive outpatient program and regularly met

with his sponsor. In addition, he was participating in domestic violence and parenting programs, attending AA/NA meetings and regularly visiting M.D.

In January 2014, the juvenile court conducted the six-month review hearing and continued father's reunification services to the 12-month review hearing which the court set in June 2014. The court advised father not to allow Michelle to have any contact with M.D. unless approved by the agency.

In April 2014, minor's counsel (counsel) filed a "Request to Change Court Order" (JV-180) pursuant to section 388 asking the juvenile court to terminate father's reunification services and set a section 366.26 hearing because he allowed contact between Michelle and M.D. and appeared to be in a relationship with Michelle. As evidence of their contact, counsel attached a declaration from Mrs. O. describing communications between father and Michelle via Facebook.

In her declaration, Mrs. O. asserts the following facts: On July 16, 2013, father posted on his page "Michelle I love you once again you most likely saved my life and for that you are my everything." Seven days into father's treatment, Michelle posted, "I'm so proud of my love, my baby daddy [father] for doing this rehab so he can get our baby back home." Someone asked her if she was continuing rehabilitation. She replied, "well, I'm just going to let my baby daddy get him back. It's much easier for him than it is for me." In December 2013, father got his first all day visit outside of the agency. Shortly after that visit, Michelle posted a picture of M.D. from that visit. In February 2014, father started overnight visits. Father told Mrs. O. that he took M.D. to his old house where his other children live. A few days later, Michelle posted a picture of M.D. and his half-sister during that visit. Mrs. O. said that father updated her weekly about Michelle's well-being but would always add "her uncle tells me." On March 25, 2014, Michelle posted a picture of dinner her mother brought her. Father told her he would see her the next day. The next day, Mrs. O. dropped M.D. off for his weekend visit. The following

4

week, Mrs. O. read a post of Michelle's which led her to Michelle's mother's page. There was a picture of Michelle sitting on a blanket holding M.D. and feeding him a bottle. Mrs. O. recognized the clothes M.D. was wearing as those she packed for him for his weekend visit with father. She also recognized father's backpack which was on the ground next to Michelle's knee.

Counsel attached screenshots of the Facebook entries referenced in Mrs. O.'s declaration and the picture of Michelle holding and feeding M.D. to the JV-180.

In May 2014, the juvenile court conducted a contested hearing on counsel's section 388 petition. Mrs. O. testified she viewed Michelle's Facebook page daily for the prior year at first because she was curious about Michelle and subsequently because she was concerned father and Michelle were in a relationship. She described the screenshots from Michelle's and father's Facebook pages and the juvenile court entered them into evidence over the objections of Michelle's and father's attorneys. The juvenile court explained it would give the screenshots the appropriate weight but was not finding that counsel had laid a proper foundation for them.

Father testified he was not romantically involved with Michelle but they had a friendly relationship. He explained "Michelle takes a place in my heart. She's the mother of my son." He acknowledged having contact with her though he believed she was using drugs. He did not, however, believe Michelle jeopardized his recovery. He said he was living in a sober living facility, had not used methamphetamine for 10 months and 26 days and finished the 12-step program and was working through it a second time.

Father also testified about the visit in March 2014 at the park where Michelle was photographed holding and feeding M.D. He said he was there with M.D. and was joined by Michelle, her mother (grandmother) and her uncle. He said he did not intend to meet Michelle there and left with M.D. as soon as he saw her. He explained that he had

5

planned to take M.D. to visit his other children. He ran into the grandmother at the bus station and she wanted to visit M.D. Father agreed to meet the grandmother at a park near the airport which he conceded was not in a safe place and required multiple bus transfers to get there. When he arrived, the grandmother was already there. Michelle's uncle arrived after a few minutes and Michelle arrived approximately 20 minutes later. Father said he did not see Michelle arrive. Previously, he gave M.D. and M.D.'s bottle to the grandmother and stepped approximately 20 to 30 feet away to talk to Michelle's uncle. While they were talking, he heard Michelle's voice, looked over toward the grandmother and saw that Michelle was holding and feeding M.D. He walked over to Michelle, took M.D. away from her and boarded a bus that was just pulling up. He said he was not watching when the grandmother gave M.D. to Michelle.

At the conclusion of the hearing, the juvenile court granted the section 388 petition, terminated father's reunification services and set a section 366.26 hearing. In ruling, the juvenile court stated it was not seriously considering granting the section 388 petition until father testified and lied about the circumstances resulting in Michelle's contact with M.D. at the park. The court concluded from father's dishonesty that he had not made substantive progress in his services plan and there was not a substantial likelihood M.D. could be returned to his custody by the 12-month review hearing. This petition ensued.

## DISCUSSION

Father asks this court to review the juvenile court's decision terminating his reunification services. He contends the juvenile court's decision was error because he made progress in his services plan and his Facebook communications were misunderstood.

When the juvenile court removes a child from parental custody, it generally orders reunification services; the duration of which depends on the age of the child. If, as here,

6

the child is under the age of three years on the date of the initial removal, the juvenile court may extend services up to the 12-month review hearing. (§ 361.5, subd. (a)(1)(B).) Here, the 12-month review hearing was scheduled to be heard in June 2014.

A parent is not entitled to a prescribed minimum period of services and the juvenile court may terminate services before the applicable statutory period has expired if termination would serve the child's best interests. In this regard, section 388, subdivision (c)(1)(B) provides that any party to a dependency proceeding, including the child, may petition the juvenile court to terminate reunification services early under certain circumstances such as when the action or inaction of the parent creates a substantial likelihood that reunification will not occur because that parent has failed to regularly participate or make substantive progress in a court-ordered treatment plan.

In order to terminate reunification services under section 388, subdivision (c)(1)(B), the juvenile court must find clear and convincing evidence that the parent failed to regularly participate or make substantive progress in his or her court-ordered treatment plan. (§ 388, subd. (c)(3).)**2**

On appeal we review the juvenile court's ruling on a section 388 petition for abuse of discretion. (*In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 881.) "In exercising its discretion, the court has 'the ability to evaluate whether the parent will utilize additional services and whether those services would ultimately inure to the benefit of the minor.' [Citation.] We will not disturb the court's determination unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. When two or more inferences reasonably can be deduced from the facts,

---

**2**      Section 388, subdivision (c)(3) also requires the juvenile court to find by a preponderance of the evidence that the agency provided the parent reasonable services. Father does not claim the services he was provided were not reasonable.

we have no authority to reweigh the evidence or substitute our judgment for that of the juvenile court.' [Citation.]" (*Ibid*.)

We conclude there is substantial evidence on this record father failed to make substantive progress in his services plan. In reaching our conclusion, we did not conduct an independent review of the evidence concerning father's relationship with Michelle as father has asked us to do. It is not our role, as an appellate court, to act as a factfinder. Rather, that is the role of the juvenile court. Our role is to review the evidence in a light most favorable to the juvenile court's decision. (*In re Heather B*. (1992) 9 Cal.App.4th 535, 563 (*Heather B*.).) In doing so, we defer to the juvenile court on decisions regarding the weight of evidence and the credibility of witnesses. (*In re Heather A*. (1996) 52 Cal.App.4th 183, 193.) We will uphold the juvenile court's decision unless no rational factfinder could reach the same conclusion. (*Heather B*., *supra*, 9 Cal.App.4th at p. 563.)

The juvenile court assessed father's credibility based on his testimony and determined that he lied about how Michelle came into contact with M.D. The court also determined that father's willingness to lie to the court signified his lack of progress in his substance abuse treatment. The juvenile court stated:

> " … I was really not convinced until I heard [father's testimony]. And … I find … his testimony … totally lacking in … credibility .… ¶ … He lied about how it all happened that [M.D.] and he and Michelle … just happened to be at [the] park.… ¶ … ¶ And I wrote down, .… 'Honesty is paramount to recovery.' And here we are, ten months, 26 days, and there is no honesty.… [I]n any substance abuse counseling, they are going to tell you you've got to be honest if you're going to be able to kick the habit.… ¶ … ¶ [I]t appeared on the surface that [father] was making progress. And now we're almost at 12 months, and I see that there might be some progress in some areas, but a major area--being honest and forthright and protective of this little boy--are not there at all. We're way far from it."

In addition, father knew that Michelle was still using drugs and had no intention of stopping. Yet he was willing to expose M.D. to her and risk his own chances of reunifying with his son.

8

On that evidence, a rational factfinder could conclude that father did not make substantive progress in his services plan and that there was not a substantial likelihood that he would reunify with M.D. by the 12-month review hearing. Thus, we conclude the juvenile court did not abuse its discretion in terminating father's reunification services and setting a section 366.26 hearing.

## DISPOSITION

The petition for extraordinary writ is denied. This opinion is final forthwith as to this court.