Filed 9/5/14  In re J.S. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.S. et al., Persons Coming Under the Juvenile Court Law. | B253147 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>J.W.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK89887) |

APPEAL from orders of the Superior Court of Los Angeles County.  Emma Castro, Juvenile Court Referee.  Affirmed in part and remanded with directions.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

J.W. (mother) appeals from the juvenile court's jurisdiction and disposition orders adjudicating her two minor children, J.S. and N.R., dependents of the court. Mother contends there is insufficient evidence to support the jurisdiction and disposition orders and the court failed to comply with the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.). The Los Angeles County Department of Children and Family Services agrees the record does not establish compliance with ICWA, but argues the court's jurisdiction and disposition orders should be affirmed. We remand for the limited purpose of directing compliance with ICWA. We otherwise conclude the jurisdiction and disposition orders are supported by substantial evidence, and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Seven-year-old J.S. and his sister, three-year-old N.R., came to the attention of the Department through a referral on May 29, 2013. A caller reported finding mother and the two children walking in the street at approximately 10:00 at night. The caller stated she was concerned for the family's safety and offered them a ride home. The caller drove the family to their house, and while in the car, N.R. asked the caller if they could come live with her because they had no light at home. The following day, the caller returned to the home with some food. The caller reported it appeared the utilities were back on, but there was no food in the house. The caller believed mother had some mental health issues or was under the influence of something as her speech was "incoherent and irrational."

In response to the referral, the Department social worker attempted to contact mother to no avail. During one visit to mother's home, the social worker spoke to a neighbor who expressed concern for the children, because mother appears to be "crazy," has "burned . . . bridges" with many neighbors, asks neighbors for food, and frequently has no utilities.

On June 6, 2013, the social worker was finally able to speak with mother. Mother allowed the social worker to come into the family home. There was minimal food, consisting only of some ramen noodles, a gallon of milk, water and cereal. The utilities

2

were functional. It appeared that N.R. slept on a mattress pad and J.S. slept on couch pillows on the floor.

Mother admitted that her utilities are sometimes turned off and that she often runs out of food before the end of the month. Mother said she received $1,400 a month in assistance, her rent is approximately $331 per month and utilities cost a couple of hundred dollars per month. Mother reported she had "an online job coming pretty soon" and that she had a dream that told her to invest $500 in stocks online, but the money was lost. She recently applied for and received food stamps, and sometimes calls the maternal grandfather or maternal great-grandmother, who both live out of state, asking for money for food.

Mother denied any substance abuse or criminal history. Mother said her stepfather "diagnosed" her as bipolar or suffering from schizoaffective disorder, but she disagreed and does not take any medications for any mental health problems. Mother said she loves her children and "home schools" them, but could not provide any paperwork supporting that the children were home schooled.

With mother's consent, the social worker interviewed the children individually and privately. J.S. was smiling and played with a ball while he talked to the social worker. He appeared developmentally on target based on his motor skills and responses to questions. J.S. said that up until a month ago, he was not eating much until his mother got food stamps. J.S. reported that mother "whooped" him with a belt as discipline, hitting his back or his butt. He denied having any marks or bruises. J.S. said his mother is nice but she can also be "really mean" and says things to him like "you are a little asshole."

N.R. appeared to be happy and well-bonded to mother. She said she likes to watch cartoons and play with her mother. N.R. said she gets "whooped" as a form of discipline.

The social worker contacted Ms. Lee at the County of Los Angeles Department of Public Social Services, who reported that mother has a $116 per month benefit for food stamps, but received a two-month upfront allotment of $217. Ms. Lee understood mother

3

apparently spent it all and there was nothing further Ms. Lee could do at that time. Ms. Lee reported the local food banks are overstretched and often without food.

The social worker reported mother had a prior referral to the Department on April 22, 2012. An anonymous female caller telephoned 911 to report she had found J.S. (who was six at the time) in MacArthur Park, alone, with a small red suitcase at about 4:00 p.m. J.S. had been alone in the park for several hours and said he only had an orange to eat for the day. J.S. asked the woman if she would be his new mother, because his mother did not love him. He explained they were living at a motel. J.S. was taken to the Rampart Police Station to determine if any missing persons report had been made. Around 6:00 p.m., mother called in a report and the woman drove J.S. to mother's location. When asked how J.S. could have been alone in the park for so long, mother reported she had fallen asleep with N.R., and J.S. had run off, which he had done before when he was four years old. Mother expressed irritation that she was being questioned about J.S.'s behavior and said "why are you punishing me for him running away?" She then called J.S. a "bastard" and said she would "take care of him later." The only food in the family's room was a carton of milk, some cheese, and a small bottle of vodka. The referral was ultimately closed as inconclusive.

At a follow-up visit to mother's home on June 24, 2013, the social worker found the only food in mother's home was pancake mix and water. Mother asked the social worker for food. Mother agreed to attend a team decision-making meeting to discuss her commitment to following a court-supervised case plan, but then failed to appear. The social worker requested that a removal order issue.

On July 19, 2013, the social worker made an unannounced visit at the home to remove the children. Both J.S. and N.R. came with the social worker willingly and did not display any upset or distress. J.S. asked if he would get to eat every day. He said he did not always eat while in the care of his mother. The social worker saw a loaf of bread, a carton of eggs, and two 12-pack cases of soda on the table, despite the heat. Mother explained the utilities were off again because she needed a deposit to have them turned back on.

4

The Department filed a petition pursuant to section 300, subdivisions (a), (b) and (j), alleging physical abuse of J.S. based on mother hitting him across the back and buttocks with a belt (paragraph a-1), failure to protect (paragraph b-1), failure to provide for the children, including failing to provide proper meals (paragraph b-2), and abuse of a sibling (paragraph j-1). The Indian Child inquiry form attached to the petition and signed by the social worker (not mother) indicates the children have no known Indian heritage, but no other information is provided in the summary section of the form.

Mother failed to appear at the detention hearing. The court trailed the case, found that a prima facie case was stated that both children were properly deemed dependent minors, and made emergency detention findings only. The next day, mother appeared and the detention hearing proceeded. The court ordered reunification services for mother, including transportation assistance.

On the Parental Notification of Indian Status form signed by mother and filed August 19, 2013, mother reported there "may" be Indian ancestry in her family through the Blackfoot tribe in Mississippi. She provided the name (Patricia S.) and telephone number of the maternal great-grandmother as a contact for further information. At the hearing held the same day, the court ordered the Department to investigate mother's claim of possible Indian heritage and deferred any ruling on ICWA.

Based on its ongoing investigation, including further conversations with the children and mother, the Department sought to amend the petition. In the Department's addendum report supporting the new allegations, Shiloh Davenport, the dependency investigator, reported that during an interview of J.S., the child reaffirmed that his mother hit him with a belt as a form of punishment. He said his mother would also make him do squats with his hands behind his head and hold the position for a long time. J.S. reported that mother also hit his younger sister with a belt for punishment, on her butt, her arm or her leg. When asked, he confirmed that N.R. was punished one time for spilling noodles while sitting on the couch, and she also would be punished by mother when N.R. hit J.S.

During additional interviews, J.S. said they did not always have food to eat every day, but that sometimes they had pizza when mother asked her father or grandmother to send them money. J.S. said sometimes they would have to ask neighbors for food.

The dependency investigator interviewed N.R. who said mother hit her. When asked to explain how, N.R. balled her hands into fists and reached around to try to hit her own back, saying "Her hit my back like this." N.R. also pointed to a large bruise on her thigh, and said she was punished for spilling noodles on the couch. Due to her age, it was somewhat difficult for the investigator to get the whole story from N.R., but she eventually said "Her hit me with a toy." The bruise was photographed and was also documented during N.R.'s HUB medical examination.

Investigator Davenport also interviewed mother and she conceded she punished the children by hitting them with her hand or a belt, but would normally try time outs first, or taking away a toy, or activity before resorting to hitting them. Mother was disorganized in her responses and difficult to follow and did not make clear what types of conduct by the children warranted being hit with a belt. Mother simply said if they did not follow the rules, they would get hit. She claimed to have stopped using corporal punishment over six months before because she did not feel it worked.

During the interview mother spoke very rapidly, changed subjects quickly, would burst out in laughter at odd times when subjects that were not humorous were being discussed, and often failed to make eye contact. Investigator Davenport reported that mother spoke so rapidly and in very long, disjointed sentences that she would often almost gasp for breath when she finished a sentence. Mother also left a series of long voicemail messages for Investigator Davenport that were rambling and somewhat incoherent, shifted topics and continued to reflect a very rapid speech pattern. Some of the messages were left at unusual times such as 4:30 in the morning.

On August 21, 2013, the court dismissed the original petition and filed the first amended petition pursuant to the Department's request. The first amended petition maintained the original allegation of physical abuse of J.S., but added N.R. as having suffered physical abuse as well (paragraph a-1); maintained the original failure to protect

allegation but added N.R. (paragraph b-1); maintained the failure to provide meals allegation (paragraph b-2); added a new allegation based on mother's untreated mental health and emotional issues resulting in an inability to properly care for and supervise both children (paragraph b-3); and deleted the abuse of a sibling allegation entirely (paragraph j-1).

The Indian Child inquiry attachment to the first amended petition states that neither child has any known Indian ancestry.

The jurisdiction and disposition report stated that on June 6, 2013, mother reported the family had no known Indian heritage, but did not otherwise address mother's assertion of possible Blackfoot ancestry on August 19. It indicated the Department attempted to locate the father of J.S., Terry S., but was unable to do so. His whereabouts remained unknown. A declaration of due diligence, documenting the Department's efforts, was filed. The identity and whereabouts of N.R.'s father also remained unknown. Mother reported she did not know who N.R.'s father was because N.R. was allegedly the product of a rape. The Department was awaiting a response to its inquiries as to whether mother had any history of referrals for child neglect or abuse in her former home state of New York.

The report documented the Department's efforts to speak with the maternal grandfather and maternal great-grandmother with whom mother remained in contact. Several messages were left for Ron R., the grandfather, who lived in New York, but the messages were not returned. Investigator Davenport was able to speak with the great-grandmother, Patricia S., by telephone. She lived in Georgia and said she tries to send money for food and talks on the phone with mother sometimes, but they mostly text. She said she had not seen the children much because mother used to live in New York, and then recently moved to California. Sometimes when they speak by phone, Patricia S. has heard mother discipline the children by giving them a time out or something similar.

Patricia S. also reported to the Department that mother previously had the children removed from her care following the birth of N.R. due to problems related to postpartum

depression. She said there is a history of bipolar disorder in their family which she believed may play a role in mother's ability to function and handle the children.

There is nothing in the report indicating that anyone discussed possible Indian heritage with Patricia S., whom mother identified as the person to ask for any such family ancestry information.

The Department further reported J.S. has never been enrolled in school. Since being in his foster home placement, J.S. was enrolled in second grade, based on his age. He does not know how to read, write or spell, but can count up to 20. The Department reported J.S. is expected to need services to help him become current with his grade level. N.R.'s foster parents reported they are looking for a Head Start program in which to enroll her, as she is not yet old enough for school. It was also reported N.R. was showing some signs of aggression toward smaller children, namely hitting. The foster parents reported that mother, despite being asked not to call after 8:00 p.m. because it is after bedtime, routinely called late at night demanding to speak with the children. She sometimes leaves messages on the voicemail where she says nothing, but plays a recorded song instead.

The social worker reported that mother leaves messages insisting on visiting with her children, but then refuses to participate in monitored visitation unless a supervising social worker is also present. Mother has been told that it is not usually possible to have both the assigned social worker and a supervisor monitor a visitation period.

During one effort to arrange a visitation period, the social worker reported that mother's speech was "random." She repeatedly said "I know I sound crazy, but I'm not. . . . I know you aren't crazy, its [*sic*] me, I meant I tried to reach my son for a week, that's how I know its [*sic*] me not you." She said her "boyfriend" would drive her to the office, then said he was not her boyfriend, just a friend. She then said she would just take the bus, and she would probably arrive at 6:00 a.m. and wanted to know when the Department office opened. The social worker told her at 8:00 a.m. and mother said she would just wait.

8

At the jurisdiction and disposition hearing, mother indicated she had concerns with her appointed lawyer. The court held a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118. Thereafter, the court appointed mother new counsel and continued the hearing date.

At the continued hearing, the court admitted the Department's reports. Mother offered a letter from a therapist which reflected mother had initiated counseling and had attended two sessions. The letter was admitted into evidence. No witnesses testified. After argument by the parties, the court took the matter under submission.

On November 20, 2013, the court ruled as follows. The court sustained the amended petition as to the allegations of physical abuse (paragraph a-1), and as to failure to protect based on mother's physical abuse and untreated mental and emotional problems (paragraphs b-1 and b-3). The court dismissed the failure to provide adequate meals allegation (paragraph b-2) in the interests of justice. The court explained the repeated use of a belt as a form of discipline on such young children constituted physical abuse, and the court did not find credible mother's claim she no longer used corporal punishment. The court also found the course of conduct by mother as exhibited during court proceedings and with the Department case workers supported the finding that mother was suffering from some level of mental health dysfunction that affected her daily functioning and ability to care for two small children.

The court further found that clear and convincing evidence supported the removal of the children from mother due to a substantial risk of physical and emotional damage based on the ongoing physical abuse and mother's untreated mental health problems.

The court ordered reunification services to mother, including a Department-approved parenting class, individual counseling to address case issues, mental health counseling and a psychological assessment. Mother was granted monitored visitation twice a week for a minimum of two hours. The children were ordered to receive individual counseling. The Department was ordered to attempt to find a foster placement where both siblings could be together. There is nothing in the court's order noting any rulings made regarding ICWA.

9

This appeal followed.

**DISCUSSION**

## 1. The Jurisdiction Order

Mother contends there is no substantial, credible evidence supporting the court's assertion of jurisdiction over the children under either subdivision (a) or subdivision (b) of section 300. We disagree.

"The standard of proof at the jurisdictional stage of a dependency proceeding is a preponderance of the evidence, and we will affirm the court's findings if they are supported by substantial evidence." (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773 [" ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' "]; and *In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

Section 300, subdivision (a) allows the juvenile court to take jurisdiction when a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm." (§ 300, subd. (a).) The statute does not provide an express definition of what constitutes " 'serious physical harm,' " but it excludes "*reasonable and age-appropriate spanking to the buttocks* where there is no evidence of serious physical injury." (*Ibid.*, italics added.)

As the Supreme Court recently explained, "section 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivisions at issue here require only a 'substantial risk' that the child will be abused or neglected. The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety,

10

protection, and physical and emotional well-being of children *who are at risk of that harm.*"  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

It is undisputed mother repeatedly used a belt on both children, ages 7 and 3, as a form of punishment, and did not limit the area struck with the belt to the children's buttocks.  Rather, mother hit the children on their backs, arms and legs as well.  J.S. reported mother made him stand for long periods of time in a squatted position, with his hands behind his head.  N.R. said mother hit her in the back with her fists and showed marks of having recently been struck (a large bruise on her thigh) as punishment for spilling food on the couch.  The evidence supports the court's determination that mother was not credible in claiming she had not used corporal punishment for six months.

The evidence amply supports the court's finding that both J.S. and N.R. were at risk of serious physical harm within the meaning of the statute.  The repeated and intentional use of a belt to strike young children, including a three-year-old, on the back, arms and legs is not an age-appropriate type of spanking as a form of discipline.  (See, e.g., *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 291 [acknowledging that corporal punishment can be appropriately administered, but "hitting with a belt and a switch crossed the line over into abuse"].)  Combined with the evidence of mother's behavior issues and mental instability, the court reasonably found the children were at substantial risk of both physical and emotional harm.

Because we conclude the court's assertion of jurisdiction under subdivision (a) of section 300 was proper, we need not reach mother's contentions with respect to the subdivision (b) findings.  " 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]"  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

We will briefly address the subdivision (b) findings.

The failure to protect allegation based on the physical abuse of both children (paragraph b-1) was adequately supported for the same reasons discussed above regarding the paragraph a-1 allegation. As for the paragraph b-3 allegation related to mother's untreated mental health issues, the record also supports the court's determination that the children faced a substantial risk of harm.

Section 300, subdivision (b) allows the juvenile court to take jurisdiction when a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the . . . inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (*Id.*, subd. (b)(1).) The record shows that in virtually every interaction mother had with the Department case workers and other third parties, she evinced a distressing level of mental instability. The children were regularly without food and basic necessities, were not attending school, have been physically abused by mother, and J.S. reported incidents of verbal abuse by mother as well. Mother has shown bizarre lapses of judgment, not the least of which was reflected by the incident in 2012 where mother reacted with irritation at the suggestion that she bore responsibility for her then six-year-old son being alone in MacArthur Park for hours. The maternal great-grandmother acknowledged her concerns for mother's ability to function on a daily basis. The record supports the court's finding on the paragraph b-3 allegation.

## 2. The Removal Order

Mother contends the court's order removing the children from her custody is also not supported by substantial evidence. Once again, we disagree.

In examining mother's claim, "we review the record in the light most favorable to the dependency court's order to determine whether it contains sufficient evidence from which a reasonable trier of fact could make the necessary findings by clear and convincing evidence." (*In re Mariah T.*, *supra*, 159 Cal.App.4th at p. 441; accord, *In re Heather A.*, *supra*, 52 Cal.App.4th at p. 193.)

The record discussed above evidences repeated physical abuse of two small children, serious lapses in judgment, and mother's daily struggle to care for two children. Further, mother failed to appear for the team decision-making meeting and was creating

obstacles to a regular and meaningful visitation schedule. Given mother's apparent mental and emotional instability, her present understanding of the case issues and ability, as well as willingness, to correct the problems that gave rise to the detention of her children remains unclear. The record supports the court's decision to order removal of both children as recommended by the Department and to order appropriate reunification services.

## 3.     ICWA Notice

Mother contends, and the Department concedes, the record does not establish compliance with ICWA. We agree.

The notice requirements of ICWA serve the salient purpose of protecting Indian children and providing a mechanism for the maintenance of tribal and familial ties for those Indian children faced with the prospect of placement in the foster care system. (25 U.S.C. § 1901; see also *In re Desiree F*. (2000) 83 Cal.App.4th 460, 469.) The threshold of information necessary to trigger ICWA notice requirements is low. (*In re Gabriel G*. (2012) 206 Cal.App.4th 1160, 1165 [ICWA triggered where mother denied heritage, but father claimed possible Cherokee tribal membership through paternal grandfather, with no biographical data other than grandfather's name].) We review the juvenile court's ruling for substantial evidence. (*In re J.T*. (2007) 154 Cal.App.4th 986, 991.)

On the only Parental Notification of Indian Status form signed by mother and included in the record, mother reported there "may" be Indian ancestry in her family through the Blackfoot tribe in Mississippi. She provided the name (Patricia S.) and telephone number of the maternal great-grandmother as a contact for further information. The Department spoke with Patricia S., but there is no showing that the subject of potential Indian ancestry was discussed. There is nothing in the record showing any effort by the Department to investigate mother's claim of possible Blackfoot heritage. The court's orders also do not reflect any findings regarding ICWA, besides the order of August 19, 2013, acknowledging mother's report of possible Indian ancestry.

The information provided by mother was sufficient to trigger the obligation of the Department to make a reasonable inquiry into mother's claim, and to serve ICWA notices

13

if Patricia S. provides any information.  (See *In re Gabriel G.*, *supra*, 206 Cal.App.4th at p. 1165; see also *In re Desiree F.*, *supra*, 83 Cal.App.4th at pp. 469-470 [the statute, as well as cases interpreting ICWA, "unequivocally require" actual notice to the tribe of both the proceedings and of the right to intervene].)  We therefore remand for the limited purpose of directing the juvenile court to order the Department to make and document reasonable inquiry regarding J.S.'s and N.R.'s possible Indian heritage and, if appropriate, to serve all requisite ICWA notices.[1]

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.  We remand for the limited purpose of directing the juvenile court to order the Department to comply with ICWA.

GRIMES, J.

We concur:

BIGELOW, P. J.

RUBIN, J.

---

[1]    The limited remand we order to ensure ICWA compliance does not require reversal of the jurisdiction and disposition orders. (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 187-188 [upon showing of failure to comply with ICWA, reversal of juvenile court's orders is only required where parental rights have been terminated; orders earlier in the proceedings may be set aside in the juvenile court in the event the minor, upon due compliance with ICWA, is shown to be an Indian child]; accord, *Tina L. v. Superior Court* (2008) 163 Cal.App.4th 262, 267-268; see also *In re Damian C.* (2009) 178 Cal.App.4th 192, 199-200 ["Although we conclude the matter must be remanded with directions to the court to ensure ICWA compliance, we decline to reverse the jurisdictional and dispositional orders.  There is not yet a sufficient showing [the minor] is an Indian child within the meaning of ICWA."].)