Filed 8/11/22  In re A.B. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.B., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E078402 |
| Plaintiff and Respondent, | (Super.Ct.No. J291369) |
| v. | OPINION |
| G.V., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Affirmed in part and reversed in part.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

G.V. (mother) appeals the removal of her daughter A.B. (Welf. and Inst. Code, § 300, subd. (b), unlabeled statutory citations refer to this code.) She argues the judge erred in two ways: first, by not considering reasonable alternatives to removal, and second by concluding the San Bernardino County Children and Family Services (department) conducted a sufficient inquiry into G.V.'s Indian ancestry as required under the Indian Child Welfare Act (ICWA). We vacate the ICWA finding and remand, but otherwise affirm.

I

FACTS

The subject of this dependency is mother's four-year-old daughter, A.B. Mother has two other adult children who are not the subjects of this dependency. Father struggles with mental health issues, including bipolar disorder and schizophrenia. He takes psychiatric medication, though he often struggles to remain on these medications. Mother had a criminal history, with an active warrant for shoplifting in Arizona. Father also had a criminal history, a misdemeanor trespassing conviction in 2008, and an aggravated trespassing conviction from August 2020. Father received three years' probation for the latter and was still on probation when these dependency proceedings began.

A.    *Events Leading to Dependency Proceedings*

Between 2019 and November 2021, police responded to domestic violence calls at mother and father's residence at least 20 times. Father's probation officer told the department that at some point police were responding to the parents' home on a weekly basis. The majority of these happened between May 29, 2021, and November 10, 2021, during which time the police responded to mother and father's residence 12 times.

On May 29, 2021, someone called the police to report that mother and father were in a dispute that had lasted for "a few hours." But when police arrived at their residence, nobody answered.

Two further incidents occurred in June. On June 4, 2021, mother called the police and told them father was under the influence, hadn't taken his mental health medication, and was trying to take A.B. A little over a week later, on June 13, police again responded to reports of domestic violence at the home. In the home they found a glass pipe used to smoke methamphetamine. Mother told the police she was just in a physical fight with father where he shoved her on the couch. Mother told police she feared for her safety and asked neighbors to call 911 but insisted she didn't want father arrested. Police arrested father for domestic battery, but the next day mother called to say she didn't want to press charges.

On July 9, 2021, an anonymous caller reported a verbal dispute between mother and father to the police. Again no one answered the door when the police arrived.

Two incidents occurred in September 2021. On September 16 mother called the police saying father "was not in his right mind," was yelling about mother going to hell, he physically dragged her into their apartment and locked her inside, and he threatened to kill himself. When police arrived, father agreed to be taken to the hospital. On September 26, 2021, an anonymous caller called police again saying they heard mother and father yelling and pushing each other, yet when police arrived mother denied father hit her.

Five incidents occurred in October 2021, all within just over a week of each other. On October 21 mother called the police saying she and father were getting divorced and father refused to leave. She said she didn't want father around A.B. "when he is acting in this manner." Two days later, someone called the police to report mother and father were arguing while A.B. was in the home. Someone called again the next day, October 24, reporting the parents were arguing, A.B. was home, and someone was throwing items. On October 28, someone reported that father was "becoming violent." The parents told the police they agreed to sleep in separate rooms for the night. Two days after that, on October 30, mother went to a neighbor's home and told them father took her phone and pushed A.B. The neighbor called the police. Father denied pushing A.B. He told them A.B. was jumping on him, and he got angry and put her on the couch, prompting an argument between him and mother.

On November 3, 2021, father's probation officer spoke to the couple about their fighting. He recommended father go to the "Department of Behavioral Health" for his

mental health issues and warned him he would be arrested if the police responded to another report of domestic violence.

Finally, on November 10, someone called the police reporting mother and father were in a verbal and physical fight. The parents yelled profanities at each other, father threw a lotion bottle at mother, and at some point mother fell to the ground and was bruised on her arm and chest. Father told the police that mother broke a door and put a hole in the wall by throwing a Minnie Mouse chair at him. The police arrested father for inflicting corporal injury on a spouse. The department also received a referral regarding A.B.

The department spoke to the parents' apartment manager on November 17, 2021. The manager said she had numerous complaints from other tenants about the parents fighting, and that A.B. was usually present for these fights. The manager said she called the police a number of times and knew of at least one neighbor who took A.B. in to protect her on a number of occasions. The manager also said earlier that day mother was in the office calling to see when father would be released and trying to arrange to pick him up. The manager said she was sure father would be back in the home as soon as he was released.

The next day, November 18, 2021, the department spoke to mother, first over the phone and then in person. Over the phone, mother said the neighbors are nosy and call the police because her family is loud. She said she and father argue a lot, but the arguments are only ever verbal. She denied the November 10 incident ever became

physical, and explained her bruises were because she tripped on a piece of wood. Mother also said father's domestic violence charge was dropped and he was being held on a probation violation.

The department then spoke to father's probation officer, who confirmed they were pursuing a probation violation against him based on the November 10 incident. He said the parents' fighting was becoming more violent, and since father's arrest, mother was " 'blowing his phone up trying to find out when [father] is being released.' "

Afterwards, the department met with mother in person. Mother said she and father separated for eight months because of his mental health issues and drug use, but recently reunified because mother thought he wasn't using drugs anymore. She reiterated that her neighbors are overly nosy and only call because she and father are too loud. However, she admitted to throwing a Minnie Mouse chair at father and putting three gouges in the wall. She again denied the fight on November 10 ever became physical, though this time she said her bruises were because she tripped on carpet rather than a piece of wood. She denied any substance abuse and said sores she had on her body were from a liver disorder.

Finally, the department spoke to A.B. A.B. told the department father was in jail " 'because he powed my mommy,' " and added that " 'mommy pows him too.' " She also demonstrated what she meant, swinging with her fists in a punching motion. She said father pushed her and mother both, causing them both to fall.

Based on these interviews and a review of police service logs, the department sought and obtained a detention warrant on November 19, 2021.

*B. Petition and Detention*

The department filed a section 300 petition on November 23, 2021, under subdivisions (b) (threat of physical harm) and (g) (no provision for support). The petition alleged mother and father abused substances, engaged in domestic violence in front of A.B., and that father suffers from unresolved mental health issues. (§ 300, subd. (b).) It also alleged father left A.B. without provision for support because he was arrested. (§ 300, subd. (g).)

On November 19, 2021, the department interviewed A.B. again. A.B. said father was in jail because "he 'pushed mommy and she fell down,' " and that " 'he pushed me too.' "

The department asked mother whether A.B. had any Indian ancestry, and mother said no. Mother did identify other family members and the department said it would continue its inquiry.

Before the detention hearing Mother and father filed ICWA-020 forms (Judicial Council Forms, form ICWA-020 (ICWA-020)). Both said they had no Indian ancestry as far as they knew. The parents also each filed a "PARENT: Family Find and ICWA Inquiry" form. Mother checked a box saying she didn't know whether she had Indian ancestry. In answering whether he had any Indian ancestry, father checked both the box saying "no" and the box saying "unknown," with some illegible writing above the "no"

7

box. The maternal grandmother, maternal aunt, and a sister also filled out forms for the department which included questions about A.B.'s potential Indian ancestry. Maternal grandmother and maternal aunt said they didn't know whether they had Indian ancestry. Sister said she didn't have any Indian ancestry.

San Bernardino Superior Court Judge Steven A. Mapes held a detention hearing on November 24, 2021. Both parents were present, though father was in custody. They denied the allegations in the petition and objected to detention.

The judge asked both parents if they had any Indian ancestry, and they both responded "[n]ot that I know of." The judge then asked if there were any blood relatives in the courtroom, and the maternal grandmother, a sibling, and a maternal aunt identified themselves. The maternal grandmother said the maternal great-great-grandmother was Indian, born in Arizona. However, maternal grandmother didn't know the name of maternal great-great-grandmother's tribe. The sister and maternal aunt both said they didn't have any Indian ancestry. The judge said that he didn't have enough information to conclude whether or not there was a reason to believe A.B. was an Indian child and directed the department to "address that."

The judge found the petition made a prima facie case, adopted the department's findings and orders, and ordered mother to drug test that day.

C. *Jurisdiction and Disposition*

The department interviewed mother again on November 30, 2021. Mother admitted she and father get into loud arguments, but again denied they ever became

8

physical. Mother said she could only recall two heated disputes, denied these disputes turned physical, and said she told A.B. to go to her room during the disputes. Mother said the neighbors who called the police are racist and made calls about multiple families in the complex. Mother again insisted the argument with father that led to this dependency didn't become physical. She said her bruises were from falling and injuries to her lip were from a cold sore. She said she called the police because she "was 'being petty and bitter.' "

The department also asked mother whether she had any Indian ancestry again, and this time she responded "Maybe." Specifically, mother said she didn't think she had any Indian ancestry but maternal grandmother said she did. However, mother said she thought maternal grandmother might have been confused.

On December 6, 2021, the department interviewed maternal grandmother about her Indian ancestry. Maternal grandmother said her family belonged to a tribe in Arizona, but she didn't know the name of the tribe. She gave the department the maternal great-grandmother's name, date of birth, place of birth (Mexico), and address at the time she died. She also gave the department her great-great-grandmother's name and year of birth, and said she was born in Arizona. Maternal grandmother said maternal grandfather and great-grandfather were born in Mexico. She said she didn't believe maternal grandfather had any Indian ancestry but provided his name and told the department he lived in Puerto Vallarta.

Two days later, December 8, 2021, the department attempted to contact the paternal grandmother to ask about her Indian ancestry but were only able to leave a message. The same day the department spoke to maternal grandmother again. She said mother and father lived with her for two years, and during that time their arguments were loud. She denied ever seeing the arguments turn physical. The department also spoke to the responding police officer. He said mother told him father pushed her. He stated that according to A.B., father pushed A.B. as well.

The next day, December 9, 2021, the social worker tried to talk to father again, but was unable to due to quarantine issues at his detention center.

On December 13, 2021, the department filed its jurisdiction/disposition report, and recommended dismissing the substance abuse allegation against mother.

According to the San Bernardino Superior Court's website, on January 4, 2022, father was sentenced to a determinate term of one year four months. (*Public Portal – Superior Court of California*, *San Bernardino County* <https://cap.sb-court.org/> [as of August 10, 2022], case No. FVI20002115.)

The judge held a jurisdiction and disposition hearing on January 19, 2022. The county dismissed the substance abuse allegation against mother. The county also summarized the department's ICWA inquiries and said they "believe the Court can make a finding today." Nobody objected to county counsel's representation, and the judge found ICWA didn't apply.

Mother objected to the remaining allegation against her and requested it be dismissed. Mother said that because father was in custody, he doesn't live in the home with her anymore and there were no further domestic violence concerns. She said she was already enrolled in services, including domestic violence services.

The judge found the allegations true, ordered reunification services for both parents, and kept A.B. detained from both parents. Mother's reunification services included counseling to address domestic violence and parenting education.

Mother timely appealed the judge's jurisdiction and disposition orders.

II

ANALYSIS

Mother argues there was insufficient evidence to support the judge's dispositional findings. Namely, mother argues there was insufficient evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of [A.B.] if [A.B.] were returned home, and there are no reasonable means by which [A.B.]'s physical health can be protected without removing [her] from [mother]." (§ 361, subd. (c)(1).) Mother also argues the department failed to conduct a sufficient inquiry into whether ICWA applied to A.B., and the judge erred in concluding otherwise.

A.  *Removal*

"Before the court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can

11

be protected without removal. . . .The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citation.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 135-136 (*T.V.*).)

Once such a harm is identified, the judge must still find "there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent[]." (§ 361, subd. (d).) "Removal on any ground not involving parental rejection, abandonment, or institutionalization requires a finding that there are no reasonable means of protecting the child without depriving the parent of custody." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525.) Out-of-home placement is a "last resort, to be considered only when the child would be in danger if allowed to reside with the parent." (*Id.* at p. 525.)

In addition, "Section 361, subdivision (c), requires the trial court to (1) determine if reasonable efforts had been made to prevent or eliminate the need for removing the minor from his or her home and (2) to state on the record the facts that led the court to order removal." (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 171, superseded by statute on another point, as noted in *In re Lucero L.* (2000) 22 Cal.4th 1227, 1239-1242.) Failure to do so is error. (*In re Basiolio T.*, at p.171.)

However, "when a juvenile court fails to make the factual findings required under section 361, subdivision (e), its removal order is subject to the constitutional mandate that no judgment shall be set aside 'unless, after an examination of the entire cause, including

the evidence, the [appellate] court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' " (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1068.) "[A] 'miscarriage of justice' will be declared only when the appellate court, after examining the entire case, is of the opinion that ' "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Ibid.*) Where a judge fails to make express findings, the appellate court implies such findings where the evidence is clear. (See *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1825.)

"We review the court's dispositional findings for substantial evidence." (*T.V.*, *supra*, 217 Cal.App.4th at p. 136.) " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." ' [Citation.]" ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

13

The alleged risk of harm here is that A.B. was exposed to domestic violence between mother and father and possibly actual abuse from father. The department doesn't allege, and there is no evidence to suggest, that mother herself ever harmed or abused A.B. Nevertheless, exposure to domestic violence "in the same household where children are living *is* neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it. Such neglect *causes* the risk." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194.) The department alleges mother's past behavior demonstrates she is unwilling or unable to acknowledge father is abusive towards her, which is in and of itself a substantial risk to her child's physical safety. Mother argues there is insufficient evidence to conclude she remains unwilling to protect A.B. from the risk posed by the domestic violence, and that the risk of harm no longer exists because father is incarcerated.

Reading the record in the light most favorable to the judge's disposition, we agree with the department there is sufficient evidence to conclude maintaining A.B. in mother's custody would create a substantial risk of harm. Mother and father have a substantial history of domestic violence, which includes multiple police interventions spanning most of A.B.'s life. Nevertheless, mother continued to live with father, told police she didn't want father to be prosecuted, took him back after every incident, and generally failed to take steps to remove herself and A.B. from her toxic relationship with father. Indeed, despite mother herself calling the police multiple times, a specific intervention by father's probation officer, and father's incarceration, there is still every indication mother intends

14

to invite father back into their home once he is released. Even after the incident giving rise to this dependency and which resulted in father's incarceration, father's probation officer told the department mother was " 'blowing his phone up' " trying to figure out how soon she could bring father home. While there is admittedly no evidence that mother herself represents any risk to A.B., the evidence is overwhelming that mother does not appreciate the threat posed by the continued domestic violence in the home. "A parent's denial of domestic violence increases the risk of it recurring." (*In re V.L.* (2020) 54 Cal.App.5th 147, 156 (*V.L.*).) Thus, the risk of A.B. being exposed to further domestic violence is high should she remain with mother.[1]

Because mother fails to acknowledge the risk of harm posed by domestic violence, there was also sufficient evidence for the judge to conclude that reasonable means didn't exist to mitigate this harm. Mother argues the judge could have issued a restraining or move out order regarding father. However, mother's behavior suggests she very much wants to keep father in the home despite the threat of violence. This alone is enough for the judge to conclude mother might ignore the court's orders or otherwise undermine them, placing A.B. at risk of further exposure to domestic violence. In other words, while

---

[1] We understand that domestic violence victims often experience cyclical abuse patterns which are sometimes hard to recognize and harder to break from. Nevertheless, a pattern of domestic violence does represent a real risk of harm to A.B. Recognizing this reality is not intended to indict mother but acknowledge that until mother and father can break this cycle. A.B. is not safe in their care. "Dependency proceedings are civil in nature, designed not to prosecute a parent, but to protect the child. . . . [T]he paramount concern is the child's welfare." (*In re Mary S.* (1986) 186 Cal.App.3d 414, 418-419.)

we can't say whether such orders could have worked, there was sufficient evidence for the judge to conclude they wouldn't have, and we are bound by that determination.

Mother also points to the fact that father is currently incarcerated, and therefore there is no present risk that mother could expose A.B. to domestic violence. But father was sentenced to 16 months five months ago. Therefore, it is highly likely father will be released before this dependency is complete, and even more likely he will be released without the dependency judge's knowledge and before the judge has an opportunity to address the changed circumstances with appropriate orders. Thus, there is sufficient evidence to conclude that removal was appropriate in order to prevent contact between mother, father, and A.B. outside the judge's or department's purview.

Given this, "we conclude a reasonable trier of fact could have found it highly probable that placement of [A.B.] with [mother] would pose a substantial risk of [her] being harmed by exposure to future domestic violence, and that there were no reasonable means to protect [her] without removal from [mother]'s physical custody." (*V.L.*, *supra*, 54 Cal.App.5th at pp. 156-157.)

For this reason, we also conclude the judge's failure to state the factual basis for the disposition was harmless error. Given the overwhelming evidence mother didn't appreciate the risk of harm posed by the ongoing domestic violence in the home, it is not reasonably probable that stating the factual basis for the removal order would have changed the outcome or otherwise prompted the judge to consider reasonable alternatives to removal.

B.    *ICWA*

Next, we turn to mother's argument that the jurisdictional findings and disposition order must be reversed in part because the finding ICWA does not apply to her children is not supported by substantial evidence. She argues the department failed to conduct a sufficient inquiry under section 224.2, subdivision (b).

"[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." (*In re A.M.* (2020) 47 Cal.App.5th 303, 314 (*A.M.*).)

ICWA requires that " '[i]n any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and of their right of intervention.' [Citation.] This notice requirement, which is also codified in California law [citation], enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the proceeding." (*In re Isaiah W.* (2016) 1 Cal.5th 1, 5.) "There are two separate ICWA requirements which are sometimes conflated: the obligation to give notice to a tribe, and the obligation to conduct further inquiry to determine whether notice is necessary. Notice to a tribe is required, under federal and state law, when the court knows or has reason to

17

know the child *is* an Indian child." (*A.M.*, *supra*, 47 Cal.App.5th at p. 315.) In order to determine whether such notice is necessary, California law states, "[t]he court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a).) Though federal law obligates courts to conduct this inquiry, California state law goes further by imposing this obligation on social services agencies as well. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741-742 (*Benjamin M.*).)

" 'The child welfare department's initial duty of inquiry includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." ' " (*In re J.S.* (2021) 62 Cal.App.5th 678, 686 (*J.S.*); see § 224.2, subd. (b).) Extended family members include adults who are the child's stepparents, grandparents, aunts, uncles, brothers, sisters, nieces, nephews, and first or second cousins. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

The law requires further inquiry only " 'when "the court, social worker, or probation officer has reason to believe that an Indian child is involved [or, under Cal. Rules of Court, rule 5.481(a)(4), 'may be involved'] in a proceeding . . . ." ' " (*J.S.*, *supra*, 62 Cal.App.5th at p. 677.) " 'When that ["reason to believe"] threshold is reached, the requisite "further inquiry" "includes: (1) interviewing the parents and extended family

18

members; (2) contacting the Bureau of Indian Affairs and State Department of Social Services; and (3) contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a tribe." ' " (*Ibid.*) Thus there are two types of inquiry relevant entities are required to conduct: an initial inquiry, which is always required, and a further inquiry, which is required only when the relevant entity has reason to believe an Indian child is or may be involved in the proceeding.

Mother argues the department failed in its further inquiry. Namely, mother argues that there was a "reason to believe" A.B. was an Indian child, yet the department did no further investigation except asking the maternal grandmother to repeat her original claims.

However, we need not address mother's contention regarding whether the department failed in its further inquiry because we conclude the department failed at the first step, the initial inquiry, in part because they didn't ask any paternal relatives about A.B.'s possible Indian status, didn't ask A.B.'s other sibling, and generally failed to demonstrate they'd properly inquired with all of A.B.'s extended relatives.

As the department acknowledges, section 224.2, subdivision (b), requires social workers to interview extended family members about whether they have Indian ancestry. Extended family members "include the child's 'grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or

19

stepparent.' " (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053.) Failing to interview extended family members is error. (*In re Darian R.* (2022) 75 Cal.App.5th 502, 509.)

The department admits it tried and failed to contact the paternal grandmother and makes no mention of any other attempts to contact any other paternal relatives. At minimum the department should have followed up to obtain some information from any paternal relative. This is compounded by the fact the department also failed to interview father himself. In addition, mother has two adult children—A.B.'s half siblings—only one of whom provided any information regarding possible Indian heritage. Therefore, from this record it is clear the department didn't ask every statutorily defined extended family member as an initial inquiry requires.

However, when an appeal concerns "the *agency's* duty of initial inquiry, only state law is involved. Where a violation is of only state law, we may not reverse unless we find that the error was prejudicial." (*Benjamin M*., *supra*, 70 Cal.App.5th at p. 742.) This means "in ICWA cases, a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Id.* at p. 744.) Thus, though the department failed in its duty to interview extended relatives, we must still determine whether this error prejudiced mother.

We conclude it did. The information the identified extended family members had was readily obtainable and likely to bear on the children's Indian status. The department had paternal grandmother's phone number and yet called only once to try to talk to her. It is also likely the department could have obtained A.B.'s other adult sibling's contact information easily and worked with law enforcement to interview father directly despite his incarceration in order to identify any other extended paternal family members.

The department argues the error was not prejudicial because almost every person questioned, including the parents but excluding the maternal grandmother, denied Indian ancestry. However, section 224.2, subdivision (b), "requires the [d]epartment to ask, as part of its initial duty of inquiry, extended family members (including the biological grandparents) whether the child is or may be an Indian child," and nothing "relieves the [d]epartment of its broad duty to seek that information . . . simply because a parent states on the ICWA-020 form . . . 'I have no Indian ancestry as far as I know.' " (*In re Y.W.* (2021) 70 Cal.App.5th 542, 554.) "Such a rule ignores the reality that parents may not know their possible relationship with or connection to an Indian tribe." (*Id.* at p. 554.) Moreover, the department's "position ignores the express obligation that section 224.2, subdivision (b), imposes on the [d]epartment to inquire of a child's extended family members—regardless of whether the parents deny Indian ancestry." (*In re Antonio R.* (2022) 76 Cal.App.5th 421, 431 (*Antonio R.*).)

Nor can the department claim their error to follow up with any additional family members wasn't prejudicial simply because they were unlikely to have information showing the children had Indian heritage. "Speculation as to whether extended family members might have information likely to bear meaningfully on whether the child is an Indian child has no place in the analysis of prejudicial error where there is an inadequate initial inquiry. Rather, in determining whether the failure to make an adequate initial inquiry is prejudicial, we ask whether the information in the hands of the extended family members is likely to be meaningful in determining whether the child is an Indian child, not whether the information is likely to show the child is in fact an Indian child." (*Antonio R.*, *supra*, 76 Cal.App.5th at p. 435.) For these reasons, "[w]here the [d]epartment fails to discharge its initial duty of inquiry under ICWA and related California law, and the juvenile court finds ICWA does not apply notwithstanding the lack of an adequate inquiry, the error is in most circumstances, as here, prejudicial and reversible." (*Ibid.*)

Accordingly, we vacate the court's findings that ICWA doesn't apply as not based on substantial evidence, and remand to permit the department to complete its initial inquiry. On remand the department should interview all those listed in the federal statutory definition of extended family members that section 224.1 incorporates (see 25 U.S.C. § 1903(2)), which includes grandparents, aunts, uncles, brothers, sisters, first cousins, second cousins, and stepparents. The department should also interview any person with information regarding the maternal grandmother's claimed Indian heritage

22

through the maternal great-great-grandmother, and anyone else with information likely to meaningfully bear upon whether A.B. is an Indian child.

C.    *Errors in Minute Order*

Finally, both mother and the department agree there are errors in the court's minute order from the jurisdiction and disposition hearing. Namely, the minute order says the judge "finds by clear and convincing evidence reasonably diligent efforts were made in attempting to locate child's absent parent(s) and these efforts were unsuccessful." The judge likely adopted this finding from a nearly identical recommended finding in the department's jurisdiction/disposition report. The parties agree this finding is simply not true because the parents were not absent and had been located. Both parents were present at the jurisdiction and disposition hearing, the department was in regular contact with mother, and the department knew where father was incarcerated.

Accordingly, we reverse the judge's factual finding that the parents were absent and efforts to contact them were unsuccessful and direct the judge to issue an amended minute order striking the erroneous finding.

III

CONCLUSION

We vacate the judge's finding that ICWA does not apply and remand. On remand we direct the judge to order the department to comply with the inquiry provisions of ICWA and of sections 224.2 and 224.3 (and, if applicable, the notice provisions as well) in accordance with this opinion. If, after completing the initial inquiry, the department or

23

the judge has reason to believe the children are Indian children, then the department and the judge shall proceed according to the terms of sections 224.2 and 224.3. Finally, we reverse the judge's finding that "reasonably diligent efforts were made in attempting to locate child's absent parent(s) and these efforts were unsuccessful." We direct the judge to amend the minute order from the jurisdiction and disposition hearing by striking that finding. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH _____
J.

We concur:

McKINSTER _____
Acting P. J.

MENETREZ _____
J.