Filed 3/25/26  In re J.K. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re J.K. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>S.K.,<br><br>    Objector and Appellant. | D087203<br><br>(Super. Ct. Nos. J518367A–D) |

APPEAL from orders of the Superior Court of San Diego County, Lilys D. McCoy, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Objector and Appellant.

Damon M. Brown, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, Natasha Edwards, Deputy County Counsel, for Plaintiff and Respondent.

S.K. (Mother), the mother of J.K., A.M., T.K., and D.W., appeals from the jurisdictional findings and dispositional orders declaring her children

dependents of the juvenile court and ordering drug testing after the court sustained a petition pursuant to Welfare and Institutions Code section 300,[1] which alleged the children were exposed to domestic violence as a result of the parents' failure or inability to adequately supervise or protect the children. Mother contends the jurisdictional findings are not supported by substantial evidence and that the court abused its discretion in ordering her to drug test as part of the court ordered case plan. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2025, the Health and Human Services Agency (Agency) filed section 300, subdivision (b)(1)(A) petitions regarding minors J.K., A.M., T.K., and D.W. The petitions alleged that in January 2025, the children were exposed to domestic violence between Mother and I.W., the father of D.W.[2] I.W. punched Mother in the face, dragged her from a couch onto the ground, attempted to drag her upstairs, and kicked her in the face and chest twice. He threw Mother against a wall and dragged her by her arm on the ground inside the apartment. Further, in June 2025, I.W. pushed Mother while she was trying to enter her car and locked her out of her car while their child, D.W., was inside. Following that incident, Mother and I.W. continued to have contact with each other in the family home, disregarding the conditions of I.W.'s parole.

At the July 2025 detention hearing, the court detained the minors in Mother's home.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     The other minors have different fathers who are not parties to this appeal.

In November 2025, the court held a contested jurisdiction and disposition hearing. The court found the petition to be true, placed the children in the home of Mother, and ordered the recommended case plan. The case plan included on-demand drug testing, and Mother's counsel did not object.

When making jurisdictional findings and dispositional orders, the court considered the submitted evidence which consisted of the social worker reports.

The detention report of July 2025 included the respective law enforcement reports for the January and June incidents.

In the January police report, Mother reported to law enforcement that I.W. punched her in the face, dragged her from the couch, and tried to drag her up the stairs. He also kicked her about twice in the chest and face. He threatened to kill her. He threw her against the wall and dragged her by the arm on the floor.

Per the June sheriff's report, a deputy sheriff observed I.W. and Mother arguing by a car. I.W. pushed Mother and entered the car, essentially locking her out of their car. I.W. reported he did not want Mother to drive because she had been drinking and their child was in the back seat. Mother told the deputy that prior to the deputy's arrival, I.W. snatched the wig off her head to embarrass her. Mother refused to answer further questions.

The social worker subsequently interviewed Mother and two of the minors about the domestic violence. For the most part, Mother minimized the incidents.

Regarding the January incident, Mother claimed I.W. and the maternal grandmother were scuffling because he was trying to move out of the house. However, A.M. disclosed to the social worker he knew Mother and I.W. got

3

into a fight. A.M. was upstairs with his brothers. He overheard people yelling and throwing things. He was scared and stayed in the room. A.M. said his then 13-year-old brother J.K. went downstairs and told someone to stop. It sounded like things were being thrown. A.M. heard J.K. saying, "Stop let go. Stop it." A.M. stated I.W. was a "bad man," and "[h]e is mean to my mom and hits her and makes her cry." In his interview, J.K. reported he remembered some yelling and arguing in the home while he was upstairs with all three of his brothers.

Mother told the social worker that the sheriff's deputy lied about the June incident. She claimed I.W. told her politely to move and then got in the car. Mother denied I.W. pulled her hair, and she denied having a wig on. She explained I.W. always snatched her wig to be funny, but never to hurt or embarrass her. She said that during the incident in front of the car, I.W. put his hands up like he was going to shove her, but he never actually touched her.

Mother also failed to take protective measures. She filed a temporary restraining order against I.W. but did not attend the hearing to make it permanent, so it lapsed. When the social worker asked Mother about an ongoing restraining order, she responded, "I don't need protection from no one. He is not going to be in my house. He was in jail." She was unwilling to create a safety plan when asked in February and July.

In July 2025, the parole agent informed the social worker that he made an unannounced visit to Mother's home, and I.W. was there in violation of the conditions of his parole. Mother told the parole agent she wanted I.W.'s conditions removed. When the agent declined, she demanded this of the parole agent's supervisor. When the social worker asked Mother about this,

4

Mother denied having spoken with the parole agent or having seen him recently. Mother denied domestic violence between her and I.W.

When the social worker met with Mother in late August, Mother said she did not see herself as a domestic violence victim. In September, Mother acknowledged that I.W. abused her and T.K.

Mother had her first individual domestic violence therapy session on September 16, 2025, and was scheduled to attend biweekly sessions in person. However, on September 25, the therapist advised the social worker that Mother missed her scheduled session in the morning and showed up late in the afternoon virtually. As of October 1st, Mother was discharged because the provider was no longer available. When the social worker rereferred Mother to a different therapist, Mother refused to respond to assessment questions. The provider explained that Mother demonstrated resistance to treatment engagement, disrupting the session in the presence of her children.

The social worker reports also addressed concerns of possible drug use by Mother.

Mother had a prior dependency case beginning in February 2012 because she left J.K. in a room alone with drugs, paraphernalia, and alcohol within his reach. Mother successfully completed the drug program requirement, and the court terminated jurisdiction with J.K. in her care in April 2013.

In July 2025, Mother disclosed she used marijuana. In September, Mother's therapist reported she saw some substance abuse and mental health related markers. In October, when the social worker asked Mother to drug test, Mother advised she had no transportation but if she found a way she would go. The social worker offered to set up a mobile test at Mother's home,

but Mother declined.  Mother again declined to test when asked three days later.

To Mother's credit, she completed a parenting class and a crisis plan.

DISCUSSION

A.    *Court's Jurisdictional Finding*

Mother contends the evidence is insufficient to support the finding that she is unable to supervise or adequately protect her children.  Thus, she argues, the jurisdictional findings and order sustaining the section 300 petitions must be reversed.

At the jurisdictional point of a dependency proceeding, the court decides whether the minor is a person described by section 300.  (*In re C.S.* (2022) 80 Cal.App.5th 631, 635.)  The petitioner has the burden to prove the basis for jurisdiction by a preponderance of the evidence.  (*In re Israel T.* (2018) 30 Cal.App.5th 47, 51.)  Section 300, subdivision (b)(1) is applicable when " '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse.'  The three-part test for jurisdiction under [this section] includes:  (1) inability to provide the necessary supervision or protection of children; (2) causation; (3) serious physical harm or illness, or the substantial risk of either." (*In re Ma V.* (2021) 64 Cal.App.5th 11, 21–22.)

Domestic violence in a household with children may constitute neglect. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194.)  Failure to protect the

6

children from substantial risk of violence and serious physical harm or illness is neglect, which causes the risk. (*Ibid.*)

We uphold the juvenile court's jurisdictional and dispositional findings if they are supported by substantial evidence. Substantial evidence means "more than a smidgeon or trace; it must be meaningful and significant and cannot be merely speculative." (*In re Ma V., supra*, 64 Cal.App.5th at p. 22.)

Here, there is substantial evidence that Mother was unable to adequately protect her children from domestic violence. The evidence shows two of the minors were aware of the abusive dynamic occurring in the home. For example, A.M. referred to I.W. as a bad man and reported I.W. would hit Mother. He disclosed he knew I.W. and Mother got into a fight in January. During this incident, he overheard yelling and throwing and was scared. J.B. went downstairs to intervene. During the June incident, baby D.B. was inside the car when I.W. pushed Mother.

Despite domestic violence occurring around the children, Mother continued to have contact with I.W. and did not take the necessary protective precautions to minimize their exposure to abuse. For example, she let a restraining order lapse. She declined twice to make a safety plan. Mother started, then restarted, domestic violence therapy, but she was resistant to treatment and did not complete more than a few sessions. She let I.W. back in the home and claimed the parole agent was lying about it. She tried to get the parole agent and his supervisor to change the terms of I.W.'s parole so she could continue contact with I.W. She also failed to show insight in that she did not see herself as a victim of domestic violence.

Given all these issues remaining at the time of the contested jurisdiction and disposition hearing, we conclude substantial evidence supported a finding the children would be at risk of further domestic violence.

B.    *Court-ordered Drug Testing*

Mother contends the trial court abused its discretion in ordering her to submit to drug testing for the Agency.

When we review the juvenile court's dispositional case plan, we look for abuse of discretion. (*In re M.C.* (2023) 88 Cal.App.5th 137, 155.) A court-ordered program must be reasonably designed to eliminate the conditions that led to the need for jurisdiction. (*Ibid.*)

Mother's trial attorney did not object to the drug testing component of the case plan but asked to dismiss the petition entirely. Mother argues that this challenge to jurisdiction preserved any objection to the case plan and relies on *People v. Partida* (2005) 37 Cal.4th 428, 434–435. *Partida* held that the requirement to object with specifics must be interpreted reasonably and not formalistically. (*Id.* at p. 435.) However, it also concluded that the objection must "fairly inform" the trial court and the other party of the specific reason for the objection so that the other party can respond accordingly and the court can make a fully informed ruling. (*Id.* at p. 434.) Such was not the case here. A blanket request to dismiss the petition could not reasonably put parties or the court on notice that Mother was also contesting the drug testing requirement. Thus, any objection related to the case plan is forfeited. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221–222 [forfeiture applies to juvenile dependency].)

Nonetheless, should we decide the issue on the merits, we would conclude the drug testing was reasonably designed to eliminate the concern about Mother's inability to protect the children due to her drug use.

The evidence presents indicia of Mother's drug use. She disclosed present marijuana use. In September, Mother's therapist reported substance abuse related markers and that Mother was presenting as unstable. In

8

addition, Mother's first dependency case involved Mother leaving drugs and alcohol within reach of J.K. when he was less than a year old. She was ordered into drug treatment for that case. During the June incident in front of the car, I.W. told the responding sheriff deputy that he did not want Mother driving because she had been drinking and their child was in the vehicle. Also, Mother twice declined to test for the social worker.

Mother misconstrues a statement from the detention report in which the Agency said there was no evidence to support she was abusing drugs or hindering her ability to safely parent. This assertion is from a December 2020 child welfare referral that was deemed unfounded. In this referral, the mother reportedly tested positive for cocaine twice (and one of those times also for marijuana). This evaluation from 2020 obviously predates more recent information that indicates Mother may have an ongoing issue with substances.

The court did not abuse its discretion in ordering drug testing as recommended.

## DISPOSITION

The jurisdictional findings and dispositional orders are affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


DO, J.


CASTILLO, J.


9